[No. E019638. Fourth Dist., Div. Two. July 13, 1998.]

JEAN BARTHELEMY et al., Plaintiffs and Appellants, v.
ORANGE COUNTY FLOOD CONTROL DISTRICT, Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.D.

COUNSEL

Sullivan, Workman & Dee, Roger M. Sullivan and Henry K. Workman for Plaintiffs and Appellants.

Laurence M. Watson, County Counsel, Edward N. Duran, Daniel P. Torres and Irving Berger, Deputy County Counsel, for Defendant and Respondent.

OPINION

RICHLI, J.—Under *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] (cited hereafter as *Klopping*), a landowner may recover in inverse condemnation for losses caused by a condemning entity's unreasonable conduct prior to actual condemnation. This case presents the issue whether damages recoverable under *Klopping* include expenses incurred in purchasing and maintaining a new location for an ongoing business for the purpose of mitigating an anticipated loss of goodwill when the existing location is condemned. On the present facts, we conclude such expenses are not compensable *Klopping* damages.

I

BACKGROUND

A. *Factual Allegations*

Because this appeal emanates from the granting of a motion for judgment on the pleadings, we assume the truth of the material factual allegations of the complaint. (*Macias* v. *State of California* (1995) 10 Cal.4th 844, 847, fn. 1 [42 Cal.Rptr.2d 592, 897 P.2d 530].) Plaintiffs' operative pleading, their first amended complaint, alleged in relevant part the following.

Since 1957, plaintiffs have owned and operated a dairy which includes about 90.47 acres in Chino, and another 120 acres about 3 miles away in Corona. The present case concerns the Chino property, and further references to plaintiffs' property refer to that property.

In 1986, Congress authorized construction of the Santa Ana mainstem flood control project to provide flood protection for parts of Orange, Riverside, and San Bernardino Counties. A major component of the project is the Prado Dam project, which involves raising the level of the dam and requires

the acquisition of flowage rights up to an elevation of 566 feet in the adjacent area. Plaintiffs' Chino property, which is in the area affected, includes about 31.317 acres at an elevation below 566 feet. The dam project therefore will require acquisition of a flowage easement or a fee interest in that portion of plaintiffs' property, plus 1.11 acres for an access road.

At various times since the late 1960's, defendant Orange County Flood Control District (District) and the Army Corps of Engineers advised plaintiffs their property was targeted for acquisition as part of the dam project. Beginning in 1975, preliminary studies were conducted, and environmental and design reports were circulated in the area throughout the 1980's. In December 1989, the District, the Corps of Engineers, and the flood control districts of Riverside and San Bernardino Counties entered into a local cooperation agreement under which the District was authorized to handle land acquisition for the dam project. Subsequently, the District made numerous public statements indicating plaintiffs' property was within the scope of the project and published maps showing the District's proposed flowage easement through the center of plaintiffs' property.

In May 1990, the District issued a public bulletin to property owners in the area of the dam, including plaintiffs, to inform them their property "may" be affected by the project. The bulletin also set forth a timetable calling for more detailed surveys from July 1990 until 1993, appraisals between 1991 and 1994, and acquisition offers from 1991 through 1994, "subject to the availability of funds." Construction on the dam was scheduled to start in 1996, "subject to the availability of Federal funds."

The District surveyed plaintiffs' property between 1992 and 1993. However, it did not begin to acquire property for the project until 1994. An appraiser hired by the District inspected plaintiffs' property in August 1994. In December 1994, however, Orange County filed for bankruptcy, and acquisition of property for the project was canceled. At that point, the District had acquired about 13 properties and had outstanding offers on about 10 others.

The District never negotiated or made an offer to purchase plaintiffs' property or an easement over it. It did, however, complete an appraisal of the property in February 1995 and purchased a nearby property in November 1995. Sufficient funding was available to acquire the part of plaintiffs' property needed for the project at all times since 1992.

Plaintiffs cannot operate their dairy profitably if one-third of their property is taken by the District. From 1990 to the present, it has been difficult to

find land suitable for dairy farming. Plaintiffs therefore knew they would have to act promptly to relocate their operations in order to avoid a major loss to their business. In 1992, plaintiffs purchased 570 acres in Tulare County for relocation of their dairy operation.[1] They were required to borrow about $2 million to buy the Tulare property.

Plaintiffs began using the Tulare property in their operations pending the District's acquisition of the Chino property. However, the District's conduct and unreasonable delay prevented plaintiffs from selling, leasing, or developing the property slated for acquisition and diminished the value of the entire Chino property. Plaintiffs also have incurred interest expenses on the Tulare property and additional expenses of maintaining two properties since 1993. These expenses will continue unless and until the District acquires the part of the Chino property needed for the project. As a result, the value of the Chino property and improvements has decreased more than $2 million. In addition, plaintiffs' entire dairy business has sustained a loss of income and goodwill.

### B. *Procedural Background*

Plaintiffs sued the District for inverse condemnation in February 1996, seeking damages for diminution in value of their real property, improvements, fixtures and equipment, and for loss of income and/or goodwill of their business. The District moved for judgment on the pleadings, asserting plaintiffs had not stated a viable claim under *Klopping* because they had failed to allege special injury to their interest in the property, failed to allege an official act by the District toward acquisition of the property, and failed to allege unreasonable delay on the part of the District. After hearing argument, the court granted the motion but allowed plaintiffs leave to amend their complaint.

Plaintiffs filed their first amended complaint, and the District again moved for judgment on the pleadings, making the same arguments as in its previous motion. After again hearing argument, the court granted the motion without leave to amend and entered judgment for the District.

## II

### DISCUSSION

### A. *Requirements for Klopping Compensation*

■ Article I, section 19, of the California Constitution provides that property may be taken or damaged for public use only if just compensation

---

[1]Plaintiffs needed 570 acres, as opposed to their existing 90- and 120-acre parcels, due to State of California requirements which limited the number of cattle per acre.

is paid to the owner. That provision authorizes not only an eminent domain proceeding instituted by a public entity to acquire private property, but also an inverse condemnation action initiated by a landowner to obtain compensation for a claimed taking or damaging of his or her property. (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 652 [131 Cal.Rptr. 646, 552 P.2d 430].) The same principles govern both types of actions. (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719].)

■ In *Klopping*, the Supreme Court recognized a right of inverse condemnation for an entity's *precondemnation* activities not amounting to an actual taking of property. It had already been established that particularly oppressive acts by a public authority, involving a physical invasion or a direct legal restraint on the use of the property, could amount to a "de facto taking" of the property even without formal condemnation of it. (*Klopping, supra,* 8 Cal.3d 39, 45.) In *Klopping*, however, the court held that ". . . when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property . . . ." (*Id.*, at pp. 51-52.)

Accordingly, the court in *Klopping* held, "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping, supra,* 8 Cal.3d at p. 52, fn. omitted.) In *Klopping*, a landowner alleged that, as a result of the city's announcements that it intended to condemn his property, he was unable to rent the property and suffered a diminution in its value reflected in the loss of rental income. The court held these allegations were sufficient to state an inverse condemnation claim. (*Id.*, at p. 58.)

Subsequent decisions have emphasized that recovery under *Klopping* requires some "direct" and "special" interference with the landowner's use of the property. In *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111], the Supreme Court stated: "In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury. [Citation.]" (*Id.*, at pp. 119-120.)

Similarly, the Court of Appeal in *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332 [153 Cal.Rptr. 895] stated the test as "whether the conduct of the public agency in question has evolved to the point where its announcements result in a special and direct interference with the owner's property . . . ." (*Id.*, at p. 355; accord, *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 956 [162 Cal.Rptr. 210].)

Absent a formal resolution of condemnation, the public entity's conduct must have "significantly invaded or appropriated the use or enjoyment of" the property. (*Contra Costa Water Dist.* v. *Vaquero Farms, Inc.* (1997) 58 Cal.App.4th 883, 899 [68 Cal.Rptr.2d 272].) Thus, decisions generally have required a showing that the public entity "acted affirmatively to lower the value of the subject property, physically burdened the property, and/or decreased the income the property produced." (*Id.*, at p. 901.) For this reason, mere designation of property for public acquisition, even though it may affect the marketability of the property, is not sufficient. "The right of a governmental body to plan for the acquisition of property is unquestioned. In the absence of special circumstances it does not give rise to an action for inverse condemnation." (*City of Walnut Creek* v. *Leadership Housing Systems, Inc.* (1977) 73 Cal.App.3d 611, 622 [140 Cal.Rptr. 690].) Further, ". . . a showing that the [entity's] conduct went beyond mere general planning may not in itself be sufficient to state a cause of action. The claimant must show that obstacles were placed in plaintiffs' path in the use of this land." (*Jones* v. *City of Los Angeles* (1979) 88 Cal.App.3d 965, 972 [152 Cal.Rptr. 256].)

With these principles in mind, we consider the viability of plaintiffs' *Klopping* claim in this case.

### B.  *Plaintiffs' Theory of Recovery*

In their complaint, plaintiffs claimed damages for "diminution in value" of their property and for "loss of income and/or Goodwill [*sic*]." On appeal, however, they concede they cannot recover for diminution in market value because there has been no de facto taking. They also appear to concede they cannot recover for lost goodwill per se at this juncture (since there has been no actual condemnation of their property), but assert that their true claim is for "*costs of mitigating* their loss of business goodwill." (Italics added.) Thus, they contend, they had to acquire the Tulare property to avoid a complete loss of goodwill upon condemnation of their Chino property, when they would no longer be able to operate the dairy at all. Consequently, plaintiffs contend, they are entitled to recover as *Klopping* damages the costs of acquiring and maintaining the Tulare property, including interest on the Tulare loan and the additional expenses of maintaining two properties, for as long as the District delays acquisition of the Chino property.

■ Although normally an appellant may not assert on appeal a legal theory not asserted below, this principle does not apply where, as here, the case was resolved at the pleading stage without leave to amend being granted. In that situation, the appellate court must consider whether the plaintiff's allegations state a cause of action under any legal theory, whether or not asserted in the trial court. (*Economic Empowerment Foundation* v. *Quackenbush* (1997) 57 Cal.App.4th 677, 684, fn. 5 [67 Cal.Rptr.2d 323]; *Downs* v. *Department of Water & Power* (1997) 58 Cal.App.4th 1093, 1099 [68 Cal.Rptr.2d 590].) ■ We therefore construe plaintiffs' argument on appeal as their true theory of liability and proceed to consider whether costs of mitigating goodwill are recoverable as precondemnation *Klopping* damages under the circumstances alleged here.

## C. *Analysis*

### 1. *Recovery of Lost Goodwill*

■ "The provisions of the state and federal Constitutions which mandate just compensation for the taking of private property for public use do not require compensation for the loss of business goodwill." (*Redevelopment Agency* v. *International House of Pancakes, Inc.* (1992) 9 Cal.App.4th 1343, 1348 [12 Cal.Rptr.2d 358]; accord, *Community Redevelopment Agency* v. *Abrams* (1975) 15 Cal.3d 813, 831-832 [126 Cal.Rptr. 473, 543 P.2d 905, 81 A.L.R.3d 174].) Code of Civil Procedure section 1263.510 (cited hereafter as section 1263.510), however, provides a statutory right to recover lost goodwill under certain circumstances. To recover lost goodwill under section 1263.510, a landowner must prove, among other things, that "[t]he loss is caused by the taking of the property or the injury to the remainder," and that "[t]he loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill." (§ 1263.510, subd. (a)(1), (2).)[2]

Section 1263.510, subdivision (b), defines "goodwill" to mean "the benefits that accrue to a business as a result of its location, reputation for

---

[2]In full, section 1263.510 provides: "(a) The owner of a business conducted on the property taken, or on the remainder if such property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following: [¶] (1) The loss is caused by the taking of the property or the injury to the remainder. [¶] (2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill. [¶] (3) Compensation for the loss will not be included in payments under Section 7262 of the Government Code. [¶] (4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner. [¶] (b) Within the meaning of this article, 'goodwill' consists of the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."

dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." Although there is no single method by which to measure goodwill, it generally represents the present value of the anticipated profits of the business. (*People* ex rel. *Dept. of Transportation* v. *Leslie* (1997) 55 Cal.App.4th 918, 922 [64 Cal.Rptr.2d 252].)

The Supreme Court considered the application of section 1263.510 in *People* ex rel. *Dept. of Transportation* v. *Muller* (1984) 36 Cal.3d 263 [203 Cal.Rptr. 772, 681 P.2d 1340]. *Muller* involved a veterinarian who was forced by condemnation of his business premises to relocate his practice. In order to avoid losing customers, he relocated to a nearby location even though the rent there was higher than if he had located farther away. The court held the owner could recover as lost goodwill the decrease in his profits attributable to the higher rent at the new location. It observed that "[t]he purpose of the statute was unquestionably to provide monetary compensation for the kind of losses which typically occur when an ongoing small business is forced to move and give up the benefits of its former location." (*Id.*, at p. 270.) The lower rent at the old location was such a benefit, and its loss therefore could be recovered as lost goodwill. (*Id.*, at p. 268.)

The court in *Muller* rejected the Department of Transportation's argument that section 1263.510 only authorized compensation for lost patronage, not for increased expenses without any loss of customers or gross income. (*People* ex rel. *Dept of Transportation* v. *Muller, supra*, 36 Cal.3d at pp. 268-269.) In dictum, it noted that, even under the department's definition of goodwill, the owner would be entitled not only to compensation for lost patronage itself, but also "for expenses reasonably incurred in an effort to prevent a loss of patronage." Since the owner elected to pay the higher rent so that he could relocate close to his former premises and thereby avoid a loss of patronage, the rent increase would have been recoverable as mitigation damages even under the department's interpretation of section 1263.510. (*Muller, supra*, at pp. 271-272.)

*Muller* was an eminent domain proceeding, not an inverse condemnation action. In *Chhour* v. *Community Redevelopment Agency* (1996) 46 Cal.App.4th 273 [53 Cal.Rptr.2d 585], however, the court concluded the right to recover lost goodwill should apply in inverse condemnation actions as well. (*Id.*, at p. 282.) The plaintiff was a restaurant owner who was forced to vacate the premises after the redevelopment agency acquired the building and terminated his lease. The court recognized that the legislative comments introducing the Eminent Domain Law (Code Civ. Proc., § 1230.010 et seq.),

of which section 1263.510 is a part, stated the law's provisions applied only to eminent domain proceedings and that the law of inverse condemnation was left for determination by judicial development. It concluded, however, that there was no reason to treat an indirect condemnee differently from a direct one where compensation for goodwill was concerned. (*Chhour, supra,* 46 Cal.App.4th at p. 279.) Consequently, the court held the plaintiff could recover goodwill lost as a result of having to cease operations at the premises. (*Id.,* at p. 282.)

Under *Muller* and *Chhour,* upon either direct or inverse condemnation, plaintiffs could seek to recover for loss of goodwill attributable to the move to Tulare, provided they proved, as required by section 1263.510, that the loss could not reasonably have been prevented and would not otherwise be compensated. Under the dictum in *Muller,* plaintiffs also could claim any expenses incurred in mitigating the loss of goodwill. (See also *Redevelopment Agency* v. *Arvey Corp.* (1992) 3 Cal.App.4th 1357, 1361 [5 Cal.Rptr.2d 161] [Section 1263.510 "requires the owner of the property to take steps to mitigate the loss of goodwill. [Citation.] Such mitigation expenses then become compensable as lost goodwill."].) Additionally, because "section 1263.510 unquestionably allows reimbursement for relocation costs," plaintiffs could claim expenses reasonably incurred in making the move. (*Unocal California Pipeline Co.* v. *Conway* (1994) 23 Cal.App.4th 331, 336 [28 Cal.Rptr.2d 429].)[3]

However, neither *Muller* nor *Chhour,* nor any other authority of which we are aware, has considered whether a business owner may recover as *Klopping* damages *prior to* actual condemnation the costs of acquiring and maintaining a replacement property in *anticipation* of eventual loss of the existing location.[4] In *Muller,* the landowner recovered his lost goodwill at the trial of a condemnation action brought by the Department of Transportation. (*People* ex rel. *Dept. of Transportation* v. *Muller, supra,* 36 Cal.3d at p. 268.) Although *Chhour* was an inverse condemnation action, the redevelopment agency conceded its acquisition of the property, which forced the plaintiff to vacate, was "the substantial equivalent of condemnation" of the plaintiff's restaurant business. (*Chhour* v. *Community Redevelopment*

---

[3]Plaintiffs could not, however, recover under section 1263.510 relocation expenses that are payable under the Relocation Assistance Act (Gov. Code, § 7262). (*Redevelopment Agency* v. *Arvey Corp., supra,* 3 Cal.App.4th 1357, 1362.)

[4]In *Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73 [185 Cal.Rptr. 159], a business owner whose premises were condemned contended that *Klopping* damages should include loss of business goodwill due to unlawful precondemnation conduct. However, the court found it unnecessary to address the issue, because it concluded there was no showing of such unlawful conduct. (*Id.,* at p. 82, fn. 4.)

*Agency, supra*, 46 Cal.App.4th at p. 277.) In contrast, since *Klopping* damages compensate a landowner for a public entity's unreasonable *precondemnation* conduct, their recovery "is permitted irrespective of whether condemnation proceedings are abandoned or whether they are instituted at all." (*Klopping, supra*, 8 Cal.3d at p. 57.)[5]

Additionally, both *Muller* and *Chhour* were based on section 1263.510. *Muller* expressly predicated its holding on the statute. (*People* ex rel. *Dept. of Transportation* v. *Muller, supra*, 36 Cal.3d at p. 272.) Although *Chhour* did not base its holding directly on section 1263.510 (since it recognized section 1263.510 was not directly applicable to inverse condemnation cases), the court concluded "as a matter of judicial development of the law, that goodwill is compensable in an inverse condemnation action *to the same extent and with the same limitations on recovery* found in Code of Civil Procedure section 1263.510." (*Chhour* v. *Community Redevelopment Agency, supra*, 46 Cal.App.4th at p. 282, italics added, fn. omitted.) Compensation under section 1263.510 would not include the precondemnation damages plaintiffs seek. For one thing, section 1263.510 does not authorize recovery without an actual taking of the property. Subdivision (a)(1) of section 1263.510 requires a claimant to prove the loss was "caused by the taking of the property or the injury to the remainder." (See also *People* ex rel. *Dept. of Transportation* v. *Leslie, supra*, 55 Cal.App.4th 918, 922 ["Section 1263.510 provides compensation for loss of goodwill in eminent domain proceedings by a *whole or a partial taking*." (Italics added.)])

Additionally, Code of Civil Procedure section 1263.530 provides that section 1263.510 is not intended to address "inverse condemnation claims for temporary interference with or interruption of business." Plaintiffs' claim for precondemnation costs of mitigating anticipated lost goodwill would appear to be the type of claim excluded by section 1263.530, since it would involve a claim for temporary interruption of a business. Indeed, plaintiffs themselves characterize their claim as "a temporary loss of profitability during the period of unreasonable delay."

Having found no existing authority dispositive of plaintiffs' *Klopping* claim, we proceed to consider whether the claim can be sustained under the general principles articulated in *Klopping* and the cases following it.

---

[5]The plaintiff in *Chhour* did, in fact, seek precondemnation damages under *Klopping*. Without much discussion, the court rejected the claim, noting the plaintiff had not alleged any specific "additional damages" beyond the deleterious impact on his business caused by the agency's effective condemnation of the premises. Since compensation for that impact presumably would be determined in conjunction with the plaintiff's claim for lost goodwill, no additional recovery under *Klopping* was warranted. (*Chhour* v. *Community Redevelopment Agency, supra*, 46 Cal.App.4th at p. 285.) Here, however, plaintiffs do claim additional damages, i.e., the costs of acquiring and maintaining a relocation property.

## 2. *Recovery of Costs of Mitigating Loss of Goodwill as Klopping Damages*

For several reasons, we conclude the mitigation damages claimed by plaintiffs here are not properly compensable as precondemnation damages under *Klopping*. First, as discussed *ante*, absent a formal resolution of condemnation, recovery under *Klopping* requires that the public entity's conduct "directly and specially affect the landowner to his injury." (*Selby Realty Co.* v. *City of San Buenaventura, supra*, 10 Cal.3d 110, 119-120.) This requirement mandates that the plaintiff demonstrate conduct on the part of the public entity "which significantly invaded or appropriated the use or enjoyment" of the property. (*Contra Costa Water Dist.* v. *Vaquero Farms, Inc., supra*, 58 Cal.App.4th 883, 899; see also *Johnson* v. *State of California* (1979) 90 Cal.App.3d 195, 199 [153 Cal.Rptr. 185] [no *Klopping* recovery where "no actual impairment of access" to plaintiffs' property].)

Liability in such circumstances "has been invoked sparingly to remedy the most egregious examples of official overreaching." (*Contra Costa Water Dist.* v. *Vaquero Farms, Inc., supra,* 58 Cal.App.4th at p. 899.) The reason for this "judicial parsimony" is that imposing liability for precondemnation conduct "risks either inhibiting legitimate preacquisition activities or promoting ill-advised precipitous condemnation action by officials concerned about exposure to additional claims of compensation." (*Ibid.*) As the Supreme Court recognized in *Klopping*, allowing recovery for all decreases in market value caused by precondemnation announcements "might deter public agencies from announcing sufficiently in advance their intention to condemn" and thus defeat the salutary purposes served by giving advance notice to the general public. (*Klopping, supra,* 8 Cal.3d at p. 51.)

For this reason, actionable injury under *Klopping* must go beyond the unavoidable consequences of an agency's designation of property for possible acquisition. The degree of impairment of a landowner's property rights which is required for a compensable *Klopping* injury is illustrated in the Supreme Court's decision in *Jones* v. *People ex rel. Dept. of Transportation* (1978) 22 Cal.3d 144 [148 Cal.Rptr. 640, 583 P.2d 165]. There, the court found liability under *Klopping* where, due to the state's plans to construct a freeway which would require part of the plaintiffs' land, the county refused to approve the plaintiffs' subdivision map. (*Id.,* at p. 152.) At the same time, the court recognized that "if the only acts of which plaintiffs complain were the adoption of the route, the designation of their land for future acquisition, and the purchase of some of the properties along the right of way, there would be no such direct and special interference with plaintiffs' rights as to justify an action in inverse condemnation." (*Ibid.*)

The District's alleged activities in this case are not materially different from the conduct the Supreme Court stated in *Jones* would not give rise to *Klopping* liability. The District adopted the flood control plan, designated plaintiffs' property for future acquisition, and acquired adjacent properties. It did nothing, however, to interfere with plaintiffs' profitable use of their property. Unlike the plaintiff in *Klopping*, who could not rent his property while the threatened acquisition remained pending, plaintiffs could and did continue to operate their dairy business on the Chino property.

*Contra Costa Water Dist.* v. *Vaquero Farms, Inc., supra,* 58 Cal.App.4th 883 involved similar facts. The landowner claimed the water district placed a cloud over the property, a working cattle ranch, for seven years by publicly announcing its intention to destroy access and flood the property, acquiring all of the major neighboring properties, and threatening to stop any proposed development in the area. (*Id.*, at p. 896.) The court affirmed the lower court's ruling that the "special and direct interference" required for a *Klopping* claim was lacking. It noted that "Vaquero's interest and permissible use of its property had not in any way been changed or reduced by the Water District's precondemnation activities." (*Id.*, at p. 900.) There were no lost rentals or other lost income, since the landowner continued to use the property for its preexisting uses of cattle ranching and wind power generation. (*Id.*, at pp. 901-902.)

Plaintiffs argue *Vaquero* is distinguishable because, while the landowner in *Vaquero* suffered no diminution in profitability while it continued to use the property during the precondemnation period, in this case "there is an alleged loss of profitability of the business conducted on the affected land." However, the "affected land" in this case is the Chino property, since that is the only land subject to potential acquisition. The District did nothing to impair plaintiffs' profitable use of *that land.* Indeed, plaintiffs acknowledge that, if they had not acquired the Tulare property, they "would have continued to enjoy the profitable operation of the dairy at the Chino location until the District got around to acquiring the flowage easement."

Thus, any impairment of plaintiffs' dairy operations was the direct result of their own conduct in purchasing the *Tulare* property, not the conduct of the District directed toward acquisition of the *Chino* property. Consequently, the kind of *direct* interference required for a *Klopping* claim is lacking. Indeed, recognition of liability under these circumstances would invite a landowner to take whatever actions it deemed necessary to relocate its operations at public expense, without any assurance that the public entity would actually acquire the original property. It would be as if the plaintiff in *Klopping* were permitted to purchase a substitute rental property, receive rent

from that property while continuing to rent the original property, and hold the city responsible for the costs of carrying two properties.

Nothing in *Klopping* or any other authority supports such a result. To the contrary, the right of just compensation mandates that the government "put the property owner in as good a position had his property not been taken." (*People* ex rel. *Dept. of Transportation* v. *Leslie, supra,* 55 Cal.App.4th 918, 923.) Compensating a business owner for the costs of acquiring and maintaining a replacement property, while still continuing to operate the original property, would put the owner in a better position than if the original property had not been taken, because the owner would have the use of two properties without the corresponding additional costs.

Plaintiffs contend they were effectively *required* by section 1263.510 to seek and acquire a relocation site for their business, because they could not recover lost goodwill under that section unless they showed the loss could not reasonably have been prevented by relocating. " 'The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable, and, consequently, when expenditures are necessary for minimization of damages, the duty does not run to a person who is financially unable to make such expenditures.' " (*Jordan* v. *Talbot* (1961) 55 Cal.2d 597, 611 [12 Cal.Rptr. 488, 361 P.2d 20, 6 A.L.R.3d 161], quoting *Valencia* v. *Shell Oil Co.* (1944) 23 Cal.2d 840, 846 [147 P.2d 558]; accord, *Valle de Oro Bank* v. *Gamboa* (1994) 26 Cal.App.4th 1686, 1691 [32 Cal.Rptr.2d 329].) Additionally, "[i]t is never necessary to expend time or money in an effort to avoid injurious consequences unless the advantage to be derived from such expenditure is almost certain." (5 Corbin, Contracts (1964) § 1042, p. 264.) It would not be reasonable or practicable to apply the principle of mitigation of damages to require—or to authorize—a landowner to borrow several million dollars to acquire relocation property at a time when the entity contemplating condemnation not only has taken no formal action to acquire the existing site, but also has done nothing to interfere with the owner's continued operation of the business on those premises.

Finally, we reject plaintiffs' argument that, because what constitutes a sufficient impairment of property rights for purposes of *Klopping* is a question of fact, the court lacked authority to determine the matter on a motion for judgment on the pleadings. Where, as here, it is evident from the complaint that the facts do not justify recovery under *Klopping*, it is proper to decide the issue at the pleading stage. (See, e.g., *Johnson* v. *State of California, supra,* 90 Cal.App.3d 195, 199 [affirming sustaining of demurrer]; *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 537 [123 Cal.Rptr. 745] [same].)

D. *Motion to Dismiss**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

### DISPOSITION

The judgment is affirmed. The District's motion to dismiss, and for an award of appraisal costs, is denied. The parties shall bear their own costs on appeal.

McKinster, Acting P. J., and Gaut, J., concurred.

A petition for a rehearing was denied August 3, 1998, and appellants' petition for review by the Supreme Court was denied September 30, 1998. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 558.