Filed 3/18/16  Thomas v. County of San Francisco CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DANIEL P. THOMAS et al., | C074974 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201100095428CUEIGDS) |
| v. | |
| COUNTY OF SACRAMENTO et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 22, 2016, be modified as follows:

On page 17, at the end of the last sentence of the second paragraph, which reads "They fail to create a triable issue there has been a taking in violation of the state Constitution, and the County is entitled to judgment on the second cause of action," add as footnote 5 the following footnote:

> For the first time in their amended petition for rehearing, plaintiffs argue
> that their predicament is analogous to that of the developers in *Jefferson*

1

*Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175 (*Jefferson*). Not so. In denying the petition for rehearing, we merely point out some of the most obvious distinctions.

In *Jefferson*, the developers submitted a development application to the City of Indio (City) to build a shopping center on approximately 27 acres. (*Jefferson*, *supra*, 236 Cal.App.4th at p. 1184.) Plaintiffs have not submitted any application to develop their property. The development application in *Jefferson* was consistent with the City's general and specific plans and zoning ordinances. (*Id.* at p. 1185.) Plaintiffs' property is zoned for a single-family home, barn, garage, pool, and appurtenances. They have not sought to change the zoning or to obtain a variance. They have not been denied any permit to build a home, etc., on the property.

In *Jefferson*, the City prohibited the development of one-third of the property indefinitely to accommodate the possible future reconstruction of a major freeway interchange. (*Jefferson*, *supra*, 236 Cal.App.4th at p. 1182.) The court found the restrictions constituted a de facto taking because they denied the developer all beneficial use of the property. (*Id.* at p. 1197.) As noted above, the trial court found that plaintiffs failed to introduce evidence to support their allegation that they had been denied all beneficial use of the property. The property remains zoned to allow the same type of development that was allowed when they bought it, and they offer no evidence they have taken affirmative steps to develop it that have been thwarted by the County.

In short, plaintiffs try mightily to fit their case into the *Jefferson* template. But they overlook the distinction between unreasonable precondemnation conduct and a de facto taking and, more importantly, between a development-ready proposal and their vague dream to build 50 or 60 houses. That is to say, the proposal in *Jefferson* was consistent with the City's general and specific plans as well as zoning ordinances, and but for the condition to leave one-third of the land vacant for a possible freeway interchange, the developer could have moved forward with the project. Clearly, it was denied all beneficial use of its property. Whereas here, plaintiffs assert they were stymied by the detention basin designation, but they submitted no evidence they, like the developer in *Jefferson*, actually tried to build on their property. Thus, there is no evidence they were denied all beneficial use of their property, and consequently, there was no de facto taking as in *Jefferson*.

There is no change in the judgment.

2

Plaintiffs' petition for rehearing and amended petition for rehearing are denied.

BY THE COURT:

          RAYE          , P. J.


          MAURO          , J.


          DUARTE          , J.

Filed 2/22/16  Thomas v. County of San Francisco CA3 (unmodified version)
### NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DANIEL P. THOMAS et al., | C074974 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201100095428CUEIGDS) |
| v. | |
| COUNTY OF SACRAMENTO et al., | |
| Defendants and Respondents. | |

The trial court granted the County of Sacramento's (County) motion for summary judgment of plaintiffs Daniel P. Thomas and Aleyamma Thomas's action for inverse condemnation of the 10-acre parcel they claim they could not develop because the County had designated the property as a flood protection detention basin (detention basin) but refused to pay for it.  The County asserts on appeal, as it did in its moving papers, that the project never advanced beyond the planning phase; it did not agree to purchase the property, nor did it attempt to acquire it; and most importantly, plaintiffs

1

have failed to raise a triable issue of material fact that any of the County's actions caused a diminution in value or precluded any beneficial use of the property.  We agree and affirm the judgment.  Plaintiffs' remaining causes of action are, for the most part, derivative of their inverse condemnation claims and fail as well.

**FACTS**

We begin with a basic description of the uncontested facts.  Plaintiffs[1] assert many other facts, most of which were included in a declaration of Daniel Thomas's friend, Richard J. Lee, that the trial court found inadmissible.  Following our synopsis of the context in which this dispute arose, we will provide additional facts that are set forth in the third amended complaint and Lee's declaration.

In 1984 plaintiffs bought 10 acres of unimproved real property in Sacramento County for $60,000.  It is located near the convergence of two creeks in an area prone to flooding.  The property is, and remains, zoned for a single-family home, barn, garage, pool, and appurtenances, but plaintiffs hoped to build 50 or 60 houses on it.  They have not attempted to change the zoning or to obtain a variance.

In the early 1990's planning, including flood control planning, began for development of an area known as the North Vineyard Station, which includes plaintiffs' property.  Potential locations for detention basins were identified and plaintiffs' property was considered a potential location, a fact that was communicated to plaintiffs by at least February 1998.  In November 1998 the Sacramento County Board of Supervisors (Board) approved the "North Vineyard Station Specific Plan" (Specific Plan).  According to the "Drainage Master Plan" approved by the Board in January 2003, development under the Specific Plan could not begin until the channels of the creeks near plaintiffs' property were improved and certain detention basins and water quality ponds were constructed.

---

[1] Both named plaintiffs, Daniel Thomas and his wife Aleyamma Thomas, are acting on behalf of themselves and as trustees of their revocable trust.

2

In 2004 plaintiffs sold the property to a developer for $532,000 in cash and a promissory note for $1,468,000. That same year, the Board adopted a public financing plan requiring landowners to provide drainage improvements, including detention and water quality basins. The improvements would be financed through the collection of fees when the various subdivisions were developed. At the time of the motion for summary judgment, there were no development plans pending that would have required a detention basin on or near plaintiffs' property. The County "never made a promise or entered into a contract with any person or entity to purchase the property or to construct a detention basin on the property."

In 2008 plaintiffs foreclosed on the property after the buyer defaulted. On January 20, 2011, plaintiffs filed their initial complaint against the County for inverse condemnation and several other causes of action.

In a declaration filed in support of the opposition to an earlier motion for summary adjudication by plaintiffs in 2012, the senior civil engineer at the County's Department of Water Resources stated that he was "not aware of any formal request from the claimant asking the Board of Supervisors to revise the North Vineyard Station land use map, change zoning, or issue a building permit" and that his office was investigating two other more desirable sites on which to locate a detention basin but there was no need to do so at that time because there was no development occurring which would increase peak flows to the creeks.

In August 2013 the trial court granted the County's motion for summary judgment and the case was dismissed. Plaintiffs appeal.

## DISCUSSION

### I

The issues on summary judgment are framed by the pleadings. (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.) Plaintiffs' third amended complaint alleges many facts the County asserts are irrelevant and, in its view, lack foundation. We

3

will summarize the pertinent factual allegations and synthesize Lee's supporting declaration, to which the County entered an objection. Although it is true that we must liberally construe declarations filed in opposition to a motion for summary judgment to determine the existence of triable issues of fact, and draw all inferences and resolve all doubts in plaintiffs' favor (*Dominguez v. Washington Mutual Bank* (2008) 168 Cal.App.4th 714, 720), we need not review the trial court's ruling that the entire declaration is inadmissible; plaintiffs lose even if we overlook the County's formidable objections and assume the contents of the declaration are admissible.[2] We review de novo the trial court's order granting summary judgment. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858.)

### A.    *The Third Amended Complaint*

Plaintiffs do not challenge the basic factual outline set forth above so much as they try to fill it in with facts to improve their position and to bemoan County politics. So, for example, they assert that in order to break a stalemate between landowners and the County as to whose property would be taken for use as a detention basin, they offered to sell their 10-acre parcel to the County. They insist the County agreed to pay them a fair price. They understood "the County would purchase the land from [them] at a value that would reflect the loss of the profit potential [they] could have obtained by building 50 homes on [their] property." Yet since 1998, and in spite of the availability of the

---

[2] The court ruled: "A supporting or opposing affidavit or declaration must do all of the following [Code Civ. Proc. § 437c(d)]: Be based on the affiant's or declarant's personal knowledge, and show affirmatively that the affiant or declarant is competent to testify to the facts stated in the affidavit or declaration, and must set forth admissible evidence. Defendants' objections to the declaration of Richard J. Lee are sustained. The Court declines to consider the 'declaration' of Mr. Lee, who purports to be 'a friend, Successor Trustee and Attorney in Fact' for Plaintiffs. The Lee Declaration is a 38 page document containing factual and legal arguments. However, Mr. Lee is not an attorney and the Court cannot properly consider what is essentially a supplemental brief without citations to evidence."

funding, the County has reneged on the agreement and made no effort to commence condemnation proceedings or pay for it, even though it was the "lynch pin" for the development of the surrounding properties. They do not, however, allege a breach of contract.

Relying on Lee's declaration, plaintiffs point to statements by a county supervisor, queries by another county supervisor, and declarations in the County's application for a federal permit as evidentiary support for their allegations. According to Lee, a county supervisor acknowledged the agreement at a public meeting and many years later told him that Lee's description of what he said sounded accurate. Plaintiffs also allege that when Lee asked the Board, on their behalf, to remove the designation of the property as a site for a detention basin, a county supervisor asked county counsel why the designation could not be removed and county counsel responded that it was part of the overall drainage plan. Finally, plaintiffs allege their property was designated as a detention basin in the County's application for a federal permit that was ultimately approved in 2009.

The alleged villains named in the third amended complaint are the director of the County's Department of Water Resources, a senior civil engineer at the Department of Water Resources, county counsel, and a deputy county counsel. They allegedly conspired to defraud plaintiffs and to persuade the Board to eliminate the County's fiscal responsibilities and pass them on to the developers.

**B.      *The Declarations***

In a declaration submitted by plaintiff Aleyamma Thomas in support of the third amended complaint, she describes her husband's declining health, their need for the proceeds from a sale of the property to the County, and their motive for hiring Lee to represent them before the County.

Lee's declaration provides most of the evidentiary support for plaintiffs' factual allegations. It is a 38-page description of his observations, conversations, review of County documents, and opinions about the 40-plus-year history of the property and

5

incorporates six previous declarations, the third amended complaint, and the declaration of Aleyamma Thomas. He begins his dissertation with one of the incorporated declarations as follows: "Given the fact that Daniel Thomas was unaware of what was going on within the County's offices regarding his property, in 2009 Daniel asked me to investigate the matter and to help him get the County of Sacramento to finally pay him for the land that the County had taken from him for the E24-A drainage water detention basin.

"Since January 2009 I have researched every Board of Supervisors meeting record I could find that is relevant to the North Vineyard Station Specific Plan (NVSSP) development area, written numerous letters and met with many County officials in personal "one-on-one" meetings, in group meetings as well as testified before the Board of Supervisors. The following is the product of more than three years of research into this matter resulting in my achieving a fairly thorough understanding of the situation.

"With this declaration I shall expose a major case of Public Agency Fraud and Abuse by explaining how the County of Sacramento transitioned from being solely responsible to pay for land that they have taken for detention basins to having placed that obligation to pay onto the property developers of the NVSSP area."

The following evidence is extracted from the Lee declaration. An associate civil engineer wrote to Daniel Thomas in February of 1998 that " 'Sacramento County Water Resources Division is working on the North Vineyard Station Specific Plan which encompasses your parcel . . . . The Board of Supervisors will be acting on the Specific Plan in the near future. They will be selecting a detention basin location and their decisions will affect your parcel. Property owners adjacent to your property have suggested reconfiguring Basin E24A to include your entire parcel. It is very important that you contact Water Resources Division as soon as possible to discuss the potential impacts.' " There was considerable discussion among Board members as to how the Specific Plan could be financed.

6

By July, Lee asserted, the County had acknowledged an agreement with Daniel Thomas because at a Board meeting a senior engineer remarked, " 'The E-24A detention basin is located on the Thomas' property with the Gerber South alignment.' [Italics omitted.]" And Supervisor Don Nottoli stated publicly that if Daniel Thomas would allow the County to designate his property for construction of the detention basin, he "could 'take the money and run.' " Many years later, Nottoli told Lee the "take the money and run" comment sounded like something he would have said.

The County thereafter applied for and eventually obtained a federal permit to allow further development.

Discussions about how to finance the Specific Plan were still ongoing in 2001. Indeed, even in 2004 Daniel Thomas testified at a Board meeting: "I came to the Board three years ago. I said the same thing. I said . . . If the County wants it, I'm prepared to give it. That is my first preference. Second preference of course, I want to develop the -- that space, and I want to build sixty homes. That was my plan, but if the County wants it, take it, but you've got to pay us, you know, the right price. That's it." The next year the land was valued at $300,000 per acre.

In 2009 the County began acquiring Specific Plan drainage properties. It was at a meeting in September 2009 that one of the supervisors asked a deputy county counsel why the County would not just remove the designation from plaintiffs' property. The deputy county counsel indicated the designation could not be removed without completely redoing the drainage plan.

## II

### Inverse Condemnation

The federal and state Constitutions require the government to provide just compensation to a private property owner whose property is taken for public use. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19, subd. (a).) Eminent domain proceedings are commonly instituted by public entities to acquire property consonant with these

7

constitutional limitations. The doctrine of inverse condemnation vindicates the right to just compensation when a public entity takes or damages private property without initiating eminent domain proceedings. (*Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492, 503 (*Joffe*).) As construed by the United States Supreme Court, "taking of property" within the meaning of the Fifth Amendment includes not only substitution of owners, but also deprivation of ownership through damage to, depreciation in the value of, or destruction of property. (*United States v. General Motors Corporation* (1945) 323 U.S. 373, 378, 383-384 [89 Law.Ed. 311].) The California Constitution is even more expansive and expressly applies when property is "taken or damaged for a public use." (Cal. Const., art. I, § 19, subd. (a).)

Whereas the government takes the initiative in eminent domain proceedings and the focus of the proceedings is on just compensation, the property owner takes the initiative in inverse condemnation, and the owner must first demonstrate there has been an invasion or appropriation of a valuable property right. The taking or damaging of the property right must directly and specifically affect the landowner to his injury. (*Smith v. State of California* (1975) 50 Cal.App.3d 529, 534 (*Smith*); *Hilltop Properties v. State of California* (1965) 233 Cal.App.2d 349, 355-356.) Plaintiffs' first two causes of action are based on different theories of inverse condemnation.[3]

In the usual inverse condemnation case there is a physical invasion of the plaintiff's property or some measure of direct interference with its possession and enjoyment. However, "an *undue* restriction on the use of private property is as much a taking for constitutional purposes as appropriating or destroying it." (*Candlestick Properties, Inc. v. San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557,

---

[3] Plaintiffs do not allege causes of action for breach of contract. Thus, we have no occasion to determine whether the County entered into a binding agreement to purchase the property as plaintiffs argue throughout the briefing.

572.) Burdensome land use regulations can constitute a de facto taking of property. (*Terminals Equipment Co. v. City and County of San Francisco* (1990) 221 Cal.App.3d 234, 243 (*Terminals Equipment*).) To establish a cause of action for inverse condemnation based on a de facto taking, the regulations must deprive the landowner of all beneficial use of his property. (*Ibid.*) "The denial of an ability to exploit a property interest heretofore believed available for development is not a taking." (*Guinnane v. City and County of San Francisco* (1987) 197 Cal.App.3d 862, 868, fn. 4.) Plaintiffs' second cause of action is based on a de facto taking of their property.

A more expansive line of cases requires compensation to landowners for a governmental entity's unreasonable precondemnation activities, even when the conduct falls short of a de facto taking. In the landmark decision *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 (*Klopping*), the Supreme Court held that "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Id.* at p. 52.)[4] We begin with an analysis of plaintiffs' *Klopping* claim.

## A.    *Unreasonable Precondemnation Conduct*

The facts in *Klopping* are clear and egregious. There is no doubt the City of Whittier had announced its intent to condemn since it had adopted a resolution to initiate eminent domain proceedings, actually commenced those proceedings, and adopted a second resolution dismissing the proceedings temporarily but declaring its firm intention to reinstitute eminent domain if a pending lawsuit was resolved in its favor. (*Klopping*,

---

[4] *Klopping*, *supra*, 8 Cal.3d 39 was not followed on other grounds in *Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297, fn. 13.

*supra*, 8 Cal.3d at p. 42.)  The Supreme Court explained that "when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated.  This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property . . . ."  (*Id*. at pp. 51-52.)  Nevertheless, the *Klopping* court recognized that precondemnation statements alone do not subject the public entity to liability, and property owners must sometimes incur incidental loss for general statements made during the planning process.  (*Joffe*, *supra*, 201 Cal.App.4th at p. 507.)

A year later the Supreme Court clarified the limits of a *Klopping* recovery.  (*Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 946 (*Helix Land Co*.).)  In *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110 (*Selby Realty*), the court rejected a landowner's claim that a designation on a general plan could amount to a taking under *Klopping*.  The city's general plan designated that streets would be built through his property, and he brought an action for inverse condemnation.  The court held that "[t]he adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property."  (*Id*. at p. 119.)  Reciting facts remarkably similar to the ones before us, the court wrote:  "The county has not placed any obstacles in the path of plaintiff in the use of its land.  Plaintiff has not been refused permission by the county to build on or subdivide its county land, and its posture is no different than that of any other landowner along the streets identified in the plan.  Furthermore, the plan is subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of [the specified] property."  (*Id*. at p. 120.)

The court's additional reasoning is precisely on point.  "If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several

10

authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land." (*Selby Realty*, *supra*, 10 Cal.3d at p. 120.)

In granting the County's motion for summary judgment, the trial court relied on another factually analogous case, *Smith*, *supra*, 50 Cal.App.3d 529. In *Smith*, the state highway commission adopted a resolution to acquire a right-of-way to construct a freeway along a route that would have bisected the plaintiffs' property. (*Id*. at p. 531.) The commission publicly announced its resolution and prepared plans and designs, including maps, which indicated that a substantial part of the plaintiffs' property would be needed for construction. (*Ibid*.) The trial court sustained the state's demurrer without leave to amend and the inverse condemnation action was dismissed. (*Id*. at p. 530.)

The Court of Appeal affirmed. The court emphasized the tentative nature of the freeway planning process: "In the instant case the state has announced only that it tentatively intends to construct a freeway along a tentative route subject to many conditions and contingencies. . . . [¶] . . . [¶] Given the uncertainties of today and the multitude of obstacles to be surmounted before formal condemnation of plaintiffs' property may take place, the present adoption appears to us to be no more than a general plan no more certain of implementation than the one addressed in *Selby* [*Realty*]." (*Smith*, *supra*, 50 Cal.App.3d at p. 535.)

The Court of Appeal in *Helix Land Co*., *supra*, 82 Cal.App.3d at pp. 946-947 relied on *Selby Realty*'s and *Smith*'s rationales in rejecting another inverse condemnation claim. The facts in *Helix Land Co*. are also instructive. For at least 20 years, various public entities in the United States concurred that a flood control channel should be built in Mexico to drain floodwaters of the Tia Juana River safely to the ocean. The Governor found there was an urgent need for the project, and the Legislature provided the funding. Helix Land Company (Helix) owned land in the Tia Juana River Valley. (*Id*. at p. 937.) Meanwhile, the City of San Diego annexed the Helix land and adopted ordinances

11

establishing floodway and floodplain fringe zones. The newly annexed land was placed into an interim agricultural zone classification. (*Id*. at p. 939.)

In its ensuing action for inverse condemnation, Helix asserted that the city's sole purpose in adopting the ordinances was to depreciate the value of its land so that it could be acquired later at drastically reduced prices. The company further alleged that the land could no longer be used for agricultural purposes and it was " 'totally precluded' " from being able to make any productive use of the property. (*Helix Land Co*., *supra*, 82 Cal.App.3d at p. 939.)

The court affirmed the judgment of dismissal. "The facts alleged in Helix's complaint do not warrant a reasonable inference that the official State actions in any way were inequitable, unlawful, illegal or in any way in excess of the law in this State and its officials. The acts actually performed by the State officials are in nature akin to the general plan of *Selby* [*Realty*], *supra*, 10 Cal.3d 110, or the adoption of the general freeway route in *Smith*, *supra*, 50 Cal.App.3d 359. These are 'several leagues short' of an expressed intent to condemn Helix's specific properties. Land use regulations involving flood control clearly involve the exercise of the State's police power." (*Helix Land Co*., *supra*, 82 Cal.App.3d at p. 948.)

Here there was no resolution of condemnation. Although a formal resolution of condemnation is not required, "the conduct of the public agency in question must have evolved to the point where its conduct does result in special and direct interference with plaintiff's property." (*Toso v. City of Santa Barbara* (1980) 101 Cal.App.3d 934, 956.) The court in *Toso* highlighted the facts demonstrating there had been no special or direct interference. "In the case at bench there was no resolution of condemnation, there was no announcement of intent to condemn, nor was there any official act by the city towards acquiring the property. While an absence of a formal resolution of condemnation is not crucial, there must be some official act or official expression of intent to acquire. In the case at bench there were public meetings, negotiations, planning, debates and an advisory

12

ballot proposition calling for acquisition but there was no official act done by the city towards acquiring the property. We have here no more than general planning that is noncompensable. Absent either a formal resolution of condemnation *or* some other official action towards the acquisition of plaintiff's property, there can be no cause of action in inverse condemnation." (*Id.* at p. 957.)

Thus, the key question is whether the County's activities "have gone beyond the planning stage to reach the 'acquiring stage.' [Citations.]" (*Terminals Equipment*, *supra*, 221 Cal.App.3d at p. 246.) "Plans for public projects can change or be abandoned; *Klopping* was never intended to inhibit long-range planning or require that public entities acquire property for proposed public improvements before it may be needed. [Citation.] Liability only attaches when the public entity has taken some action toward actually acquiring the property." (*Joffe*, *supra*, 201 Cal.App.4th at pp. 507-508.)

*Klopping*'s progeny have planted some guideposts. The plaintiff's property must be singled out for unique treatment (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1548), but the mere designation of the property for acquisition is not sufficient even though the designation may affect the marketability of the property (*Barthelemy v. Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558, 565). Informal representations by public officials do not constitute the requisite official action toward acquisition and do not rise to the level of demonstrating a present intent to acquire. (*Joffe*, *supra*, 201 Cal.App.4th at p. 509.) Nor does the commission of an appraisal. (*Id.* at pp. 508-509.) Preliminary and limited agreements, which do not obligate the public entity to commence or complete construction, have not reached the acquiring stage. (*City of Fresno v. California Highway Com.* (1981) 118 Cal.App.3d 687, 694.)

Plaintiffs proffer a few tidbits primarily from Lee's declaration as evidence that the County's conduct had advanced beyond planning to acquisition. They point to the designation of their property as the location for a detention basin on the County's

13

application for a federal permit. They provide excerpts from Board meetings during which their property is discussed as a potential site for a detention basin. In particular, they rely on one county supervisor's advocacy for the development and for expediting payment to the affected landowners, and county counsel's representation that the designation of their property as a site for a detention basin could not be removed from the Specific Plan. As the host of cases discussed above vividly demonstrates, plaintiffs' evidence "is several leagues short of a firm declaration of an intention to condemn property." (*Selby Realty*, *supra*, 10 Cal.3d at p. 119.)

Plaintiffs remind us of the light burden they bear to expose triable issues of material fact and our duty to liberally construe the evidence in their favor. We have faithfully discharged our duty, mindful of the standard of review of a summary judgment. In addition, we have considered Lee's declaration, a document the trial court found nothing more than an unauthenticated and irrelevant supplemental brief. Nevertheless, plaintiffs have not sustained their burden, however light, of creating a triable issue under their *Klopping* theory of recovery.

The undisputed facts demonstrate that the County engaged in a protracted and robust planning process for the development of the North Vineyard Station. Because the development was located in an area prone to flooding, there was considerable discussion about the location of detention basins. But as cited above, mere designations, informal discussions, preliminary plans, and even general plans are all part of the planning process that may change with the economy, the politics, and a multitude of factors that affect the desirability and feasibility of development. Simply put, plaintiffs fall woefully short of presenting any evidence that the County had officially commenced acquisition of their property, and the County's evidence is all to the contrary. Declarations by County staff demonstrate that there were no development plans pending; plaintiffs' property was not the only, and not the most desirable, site for a detention basin; and the County had not

14

proceeded with the project. Thus, there is no evidence the process had moved from the planning to the acquiring phase.

We have no reason to doubt plaintiffs' allegations that they volunteered to sell their property for a fair price or that their offer to do so expedited the negotiations. Nor do we doubt their good faith or their reliance on the assurances they were given. But their motives are irrelevant to their inverse condemnation claim. And informal assurances do not represent official action.

Nevertheless, plaintiffs excoriate the County for the delay, for the unfulfilled promises, and for the misleading public statements county officials made, including the inclusion of the designation of their property on the federal permit application. Because we find as a matter of law that there are no triable issues of fact as to whether the County entered the acquisition phase, we need not decide whether the County's conduct was unreasonable. Without deciding the issue, we note, however, that as disappointed as plaintiffs may be that the County has not purchased their property, the examples they cite appear to be nothing more than the vagaries and uncertainties of the political planning process.

## B.    *De Facto Taking*

In their second cause of action, plaintiffs allege that the County "effectuated a regulatory taking or otherwise injured the Thomases' property by unlawful acts without paying compensation or providing an adequate remedy or compensation for the loss. The new fees imposed by the [Specific Plan] made it uneconomical to develop.

"[The County's] confiscatory regulations and actions effectively deprived plaintiffs and petitioners' land of all use or value, rendering it economically idle and therefore valueless.

". . . The actions of [the County] have resulted in permanent and temporary takings, deprived plaintiffs and petitioners of their investment-backed expectations and have otherwise damaged them and their property. For that reason, the actions of [the

15

County] constitute an unlawful taking and damaging of plaintiff and petitioners' property in violation of article I, section 19 of the California Constitution."

A plaintiff's burden of proving a regulatory taking is more onerous than proving unreasonable precondemnation conduct. "[A] regulation that deprives a property owner of all economically beneficial or productive use of his or her land constitutes a per se taking, regardless of the governmental interest advanced by the regulation, unless the intended use is already proscribed by extant state rules." (*Outdoor Systems, Inc. v. City of Mesa* (9th Cir. 1993) 997 F.2d 604, 618.) " 'But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole.' [Citation.]" (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 10.) "In every case in which a landowner seeks compensation for burdensome regulation of his or her property, the standard remains whether the regulations in issue have deprived the landowner of *all use* of the property. . . . 'The denial of an ability to exploit a property interest heretofore believed available for development is not a taking. [Citation.]' [Citations.]" (*Terminals Equipment*, *supra*, 221 Cal.App.3d at p. 243.)

While plaintiffs' third amended complaint clearly delineates between unreasonable precondemnation conduct and regulatory taking in the first and second causes of action, the briefs do not. Yet a critical distinction between the two is clear. Whereas a plaintiff need only show a diminution in value for a claim predicated on precondemnation conduct, to prove a regulatory taking the plaintiff must prove he has been deprived of all use of the property. (*Terminals Equipment*, *supra*, 221 Cal.App.3d at p. 243.) Plaintiffs alleged the County's designation of their property as a detention basin for floodwaters amounted to a denial of all economically viable use of the property.

16

Plaintiffs did not, however, introduce evidence to support this claim. The trial court described plaintiffs' dearth of evidence this way. "Plaintiffs do not appear to dispute that to date they received a substantial profit from the 2004 sale of the property, which was then apparently deeded back to them when the buyers defaulted on the promissory note. Plaintiffs also do not to [*sic*] dispute that the current zoning designation on the property permits development. [Citation.] Plaintiffs failed to refute Defendants' showing that Plaintiffs retain an economically viable use of their property because they are currently permitted to develop the property and because Defendants have taken no sufficiently definite action toward the property to constitute a regulatory taking. Plaintiffs' argument that Defendants are obligated to purchase the property pursuant to a prior agreement is simply not relevant to Plaintiffs' constitutional takings claim. Accordingly, Plaintiffs have failed to raise a triable issue of material fact with regard to their loss of economically viable use of the property . . . ."

We agree with the trial court. Assuming that a designation as a detention basin constitutes, or is sufficiently analogous to, a regulation to avoid summary judgment, plaintiffs must produce evidence to create a triable issue that the use of their property was no longer economically viable at all. As the trial court emphasized, not only does the property remain zoned to allow the same type of development that was allowed when they bought it, but they made a substantial profit when they sold the property. They do not offer any evidence that the property was thereafter rendered unmarketable. Thus, they continue to own property they can either develop or sell, and therefore it remains economically viable. They fail to create a triable issue there has been a taking in violation of the state Constitution, and the County is entitled to judgment on the second cause of action.

## III

The trial court granted summary adjudication of plaintiffs' causes of action for denial of due process and equal protection and for a writ of mandate. Each of these

17

causes of action is derivative of their inverse condemnation theories. We assume plaintiffs recognize these causes of action survive or fail based on whether they have submitted sufficient evidence to create a triable issue as related to inverse condemnation because they do not challenge the trial court's ruling on the third, fourth, or fifth cause of action and do not argue them on appeal. In the absence of briefing as to these causes of action, the issues are waived.

## DISPOSITION

The judgment is affirmed.

        RAYE        , P. J.

We concur:

      MAURO      , J.

      DUARTE      , J.

18