Filed 4/14/23  Ramsey v. City of Chowchilla CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JEFFREY W. RAMSEY, as Trustee, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF CHOWCHILLA, <br><br> Defendant and Respondent. | F083230 <br><br> (Super. Ct. No. MCV082800) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Michael J. Jurkovich, Judge.

FisherBroyles, Paul J. Beard; Glick Haupt Marino, Fred K. Glick, Michael D. Haupt, and Lisa R. Hamon, for Plaintiff and Appellant.

Lozano Smith, Mary F. Lerner, Mark K. Kitabayashi, and Michael R. Linden, for Defendant and Respondent.

-ooOoo-

Plaintiff and appellant Jeffrey W. Ramsey, in his capacity as trustee of the 1983 Ramsey Revocable Trust, appeals from a judgment of dismissal after an order sustaining a demurrer to his verified second amended complaint without leave to amend. Judgment was entered in favor of defendant and respondent City of Chowchilla.

## FACTUAL AND PROCEDURAL BACKGROUND

The register of actions in this matter shows Ramsey filed the underlying action against the City of Chowchilla (City) on December 17, 2019, and filed a first amended complaint on March 19, 2020. The register of actions further indicates a demurrer to the first amended complaint was filed on April 15, 2020, and an order thereon was issued on September 21, 2020.[1]

### I.   Factual Background as Alleged in the Governing Complaint

On October 8, 2020, Ramsey filed his verified second amended complaint for (1) inverse condemnation; and (2) precondemnation (*Klopping*[2]) damages (hereafter, the governing complaint). (Unnecessary emphasis omitted.) The following allegations are taken from the governing complaint.

Ramsey is the trustee of the 1983 Ramsey Revocable Trust. In that capacity, Ramsey owns a 4.71-acre parcel of real property located at 25849 Highway 99, Chowchilla, California (subject property). The subject property is currently improved with a 1,400-square-foot office building, paving, fencing and utility services. The remainder of the subject property is vacant land.

Ramsey purchased the subject property in 2002, and from then until July 2008, he operated a trailer sales dealership on the property.

---

[1]    The record on appeal does not include copies of the original or first amended complaint. Nor does it include paperwork related to the aforementioned demurrer or the September 21, 2020 order on the demurrer.

[2]    *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 (*Klopping*).

**A.** ***Early Communications Between City and Ramsey Concerning the Potential Sale and Purchase of the Subject Property, and the Potential Condemnation of the Subject Property***

In 2005, City initiated discussions with Ramsey concerning a highway improvement project known as the SR 99/233 Chowchilla Interchange Improvement Project (highway project). During these discussions, Ramsey learned City would need to acquire the subject property for the highway project. City officials told Ramsey the highway project was an " 'eminent domain project,' and that the [subject property] would be acquired for just compensation."

In 2005 and/or 2006, Ramsey attended "two community outreach meetings" concerning the highway project held by City's project consultant and whereat Ramsey and other affected property owners were able to discuss and learn about the project from City staff members.

In late 2007, City solicited from Ramsey "the price at which he would be willing to voluntarily sell the [subject property] to … City." In September of 2007, Ramsey obtained an opinion of value from a broker to use in negotiations with City. City obtained its own appraisal for the property in November 2007. The appraisal stated its purpose, as follows: " '[t]he value is to be used for acquisition by [City].' " The appraisal set a value for the subject property as of November 29, 2007, at approximately $2.7 million. Ramsey "believed that he and … City would promptly begin negotiating the acquisition price" for the subject property.

On October 27, 2008, City wrote Ramsey concerning the status of the highway project and when the parties would begin negotiations for acquisition of the subject property. Among other things, the letter stated, "City is awaiting an approved Project Study Report (PSR) for the [highway project ]," which was expected to take several weeks and "[a]fter approval of the PSR, property negotiation can occur…. [¶] Once … City establishes who will take the lead on property acquisition, … City will contact you

due to the fact that your property must be acquired in order to construct the new interchange."

On December 15, 2008, City wrote Ramsey again. Among other things, the letter stated, "[t]his letter is in response to various questions and letters … City has received in reference to the [highway project] which will involve the acquisition of property you own within the project area. At this time there are items that … City still must complete prior to engaging in property acquisition negotiations with you…. [¶] City is not yet in a position … to commence actual negotiation[s]," "City … will continue meeting and working with CalTrans[3] on this project and it appears certain that your property will be acquired as needed Right-of-Way to complete the project." The letter further identified the following items that were pending approval by CalTrans and/or City: (1) a draft PSR (to be approved by CalTrans); (2) an "Amendment of the Cooperative Agreement with Cal[T]rans (to be approved by City)"; and (3) "an appraiser and certified right-of-way agent [to] act on behalf of City and begin research on parcels (including yours) that are impacted." City indicated in the letter that CalTrans regulations required the above itemized items be addressed (a process that was anticipated to be completed by February 2009) before acquisition negotiations could begin.

On June 1, 2009, City again wrote Ramsey with respect to the highway project. The letter stated, in part, "City has initiated the process of land appraisal for the additional right-of-way needed." It indicated that approval of the PSR process was still underway and that a meeting was scheduled for the following week "to finalize the PSR discussions in preparation for the PSR to be signed by July 31, 2009"; that City would be awarding contracts for the appraisal and "Right of Way Services"; and that City "anticipated … [it] will complete the appraisal and property negotiation process and move to acquire needed land" within the following 18 months.

---

[3] The California Department of Transportation (hereafter, CalTrans).

On August 17, 2009, City wrote Ramsey and advised an appraiser and a right of way agent had been selected and would be retained by City to assist with the highway project. The letter was accompanied by a memorandum that indicated a past meeting on December 18, 2008, was held to discuss the project and indicated "[t]he first phase of the project was discussed and is proposed to include 3 parcels," one of which was the subject property. The memorandum provided further detail concerning other past and anticipated future events related to the project and indicated, "[o]nce the above referenced steps have been concluded, the anticipated 'start date' related to this project will officially commence on September 15, 2009." "Substantially identical representations were also made by … City on or about April 13, 2009, and May 6, 2009, which identified the first phase of the [highway project] as including [the subject property]."

After 2009, Ramsey received no further updates on the highway project. However, the project was covered by the news media, City officials gave statements regarding the project status and published documents related to the project and the rezoning of property including, without limitation, the subject property.

After Ramsey closed his trailer dealership on the subject property, he "ceased utilizing" the property and engaged a real estate agent to market the property for sale and/or lease. While the property was listed, Ramsey "engaged in negotiations with approximately twelve prospective buyers and/or long-term tenants that were interested in the [subject property]." Ramsey alleges he was required to, and did, disclose City's intent to acquire the subject property for the highway project to these prospective tenants/lessors who, thereafter, were no longer interested in the property.

The lack of interest in purchasing and/or leasing the subject property, Ramsey alleges, was due to City's known intent to acquire the property for the highway project. After Ramsey's real estate agent listed the property for eight years with no success, the agent withdrew as listing agent.

Ramsey alleges the subject property was vacant from August 2009 through 2010 "because the cloud of eminent domain made it impossible to lease." Beginning in late 2010, Ramsey was only able to lease the property on a month-to-month basis to "undesirable tenants" at below market rates. Ramsey leased the property for only $800 per month during the period February 2012 through February 2017. His current tenant leases the property for $1,000 per month—less than one-tenth its market value; is 22 months behind in rent; owes Ramsey $22,000 in back rent; has moved to Colorado; is no longer operating at the [p]roperty; and is only storing equipment there. Ramsey and his tenant agreed to terminate the lease and to give the tenant a period of time to remove his equipment.

"Given the relative absence of commercial improvements necessary to attract a viable paying tenant," Ramsey alleges he "has been unable to find *any* economically beneficial use for the [subject property]" because, in 2019, and unbeknownst to him at the time, City had rezoned the property.

### B. Additional Events Related to the Highway Project and Subject Property

On May 2, 2011, City adopted the "Chowchilla 2040 General Plan, including … Errata dated May 2, 2011" (the General Plan). In the General Plan, the subject property was designated "Public Facilities." However, the subject property remained zoned as C-3 General and Service Commercial.

On or about May 29, 2014, Ramsey received notice that CalTrans would be performing environmental studies in connection with the highway project. Ramsey consented to CalTrans inspecting his property. In February of 2016, CalTrans published an "Initial Study with Proposed Mitigated Negative Declaration" (hereafter, environmental study) for the project. (Unnecessary capitalization omitted.) The subject property was among the proposed property acquisitions for the "Build" alternative. The environmental study indicated the "Build" alternative would require the "total

6.

acquisition" of the subject property. The environmental study also included a "No-Build" alternative under which "no acquisition of property would occur."[4]

Ramsey alleges City has routinely continued to review and reference the highway project in its meetings and meeting minutes and "all indications are that the [highway project] will be completed." Ramsey alleges City has been working toward completion of the project "at an unreasonable and oppressive pace, with the effect of intentionally suppressing the value of [the subject property] in anticipation of formal eminent domain proceedings."

Ramsey "informed … City, at least twice in 2017, that its pre-condemnation actions were undermining his ability to sell the [subject property]."

Ramsey resumed his attempts to market the subject property in late 2018. A prospective buyer was located in the spring of 2019. Ramsey alleges the prospective buyer pulled out of negotiations after the buyer learned from City officials that the subject property had been rezoned to Public Facilities/Drainage Basin and was under threat of condemnation.

Ramsey alleges he was shocked to learn of the rezoning because he had not received notice City was intending to rezone the subject property and the zoning map on City's website continued to show the property as designated "C-3 General and Service Commercial," its previous zoning designation. Although he did not learn of it until October of 2019, the property had apparently been rezoned by City on or about May 14, 2019. Under the previous zoning designation, Ramsey alleges, the property could be utilized for a variety of commercial uses including restaurants, offices, retail shops, and gas stations.

---

[4]    Aside from the general allegation that a "cloud of condemnation" resulted from City's conduct, Ramsey does not allege the environmental study performed by CalTrans resulted in any damage to the subject property or his rights therein.

7.

Section 18.36.010 of the Chowchilla Municipal Code (hereafter, Municipal Code) provides the following purpose and application of a Public Facilities zone: "This chapter shall apply to all land within the Public Facilities (PF) zone. The purpose of the PF zone is to provide locations for public and private institutional uses including, but not limited to, community facilities, parks, school facilities, libraries, cemeteries, wastewater treatment facilities, storm drainage basins, water recharge areas, public safety facilities (fire and police), public transportation and public works facilities, the Chowchilla Madera Fairgrounds, the Chowchilla Airport, and other similar public uses and facilities on property owned and/or operated by a local, state or federal agency."

Section 18.36.020 of the Municipal Code provides under "Permitted uses" that "[u]ses shall be permitted or not permitted, conditionally permitted, administratively permitted, or temporarily permitted as prescribed in the land use table in Section 18.08.030." (Unnecessary emphasis omitted.) The table of permitted uses for the PF zone designation provides a number of public and private uses permitted by right, and by conditional use permit (CUP), administrative use permit, or temporary use permit.

Because the subject property was rezoned, Ramsey alleges its use is "severely restricted … compared to surrounding properties." The property "is in the center of a commercial district and is the only property limited to a non-commercial, non-economically-viable use." Ramsey alleges this is especially problematic for him because in 2017, he lost a 4,880 square foot metal building to fire and, as a result of the rezoning, he is prohibited from "rebuilding said metal building or making any improvement that would sustain an economically viable use" and would similarly prohibit him from entering into a lease with a tenant that wanted to develop the subject property.

Ramsey alleges the new zoning of the subject property "constitutes a special and direct interference" with the property; has had "a significant negative effect on [its] use and enjoyment"; has lowered its value; and has "eliminat[ed] the income it otherwise

8.

could produce." He alleges he has been singled out since no other properties subject to acquisition for the highway project have been similarly rezoned or restricted in their use.

Thus, Ramsey alleges, uses to which the subject property could have been put are now barred as a result of the rezoning and the value of the property was much greater under the prior zoning designation than it is under the Public Facilities/Drainage Basin zoning designation. "For at least 22 months and to this day," Ramsey alleges, he "could not and cannot rely on income generated from the [subject property]" to meet the various expenses of the property "which are in excess of $10,000 per month." The new zoning "restrictions prevent any and all economically viable use of the [subject property], and the cloud of condemnation continues to prevent [its] sale."

Ramsey alleges the rezoning of the subject property is evidence City intends and has acted "to acquire the [subject property] for the [highway project] at a dramatically depressed price"; that he is informed and believes "City will utilize the [subject property] as a drainage basin in connection with the [highway project]"; that "City has admitted that the [subject property] was designated Public Facilities in … City's General Plan based on the presence of the [highway project]"; that City's "[n]ew [z]oning [m]ap was updated to reflect this designation in the General Plan"; that "City's intent to condemn the [subject property] is indisputable, and … City is now in the acquiring stage of taking the [subject property] for the [highway project]."

Ramsey alleges "the decision to adopt the [n]ew [z]oning [m]ap is final" and "no further administrative appeals or other administrative remedies from that final decision" are available.

## II. Procedural Background

Ramsey filed the governing complaint on October 8, 2020. The governing complaint contained two causes of action, the first for inverse condemnation based on the allegation that City's conduct in rezoning effectuated an actual taking and/or eliminated the economic/beneficial value of the subject property, and the second for *Klopping*

9.

damages resulting from alleged unreasonable and oppressive precondemnation conduct by City which significantly diminished the value of his property and Ramsey's return on investment.

On November 9, 2020, City demurred to the governing complaint on grounds the first cause of action "fail[ed] to allege facts demonstrating that … City effectuated any taking of [the subject property] that would entitle [Ramsey] to just compensation" and the second cause of action "fail[ed] to allege facts demonstrating that [Ramsey] is entitled to pre-condemnation damages, as the activities complained of were merely planning activities that are not actionable." Ramsey filed his opposition on December 29, 2020, and City filed its reply thereto on January 4, 2021.

On February 17, 2021, the trial court issued a tentative ruling to sustain the demurrer. The tentative ruling indicated Ramsey should be prepared at the hearing to discuss whether leave to amend should be granted.

On February 23, 2021, the hearing on the demurrer was held and, following argument, the matter was taken under submission.

On March 2, 2021, the court issued its Order Sustaining Demurrer to Plaintiff's [Governing] Complaint Without Leave to Amend and adopted its February 17, 2021 tentative ruling.

On July 1, 2021, judgment was entered in favor of City. Notice of entry of the judgment was served by mail on August 13, 2021, and filed on August 16, 2021.

On August 23, 2021, Ramsey timely filed a notice of appeal from the judgment.

## DISCUSSION

In two separate requests, Ramsey has asked this court take judicial notice of the zoning map adopted by City in or about May 2019, and the General Plan Land Use Map adopted by City on or about June 8, 2010. The requests were not opposed by City and we deferred ruling on the requests pending consideration of the merits of the appeal. Both

10.

documents are judicially noticeable under Evidence Code section 452, subdivisions (b), (c) and (g). We grant Ramsey's request to judicially notice those documents.

## I. Standard of Review

The parties agree the standard of review on appeal is de novo. We concur. "In reviewing a judgment following the sustaining of a demurrer without leave to amend, we decide de novo whether the complaint states facts sufficient to state a cause of action." (*Bower v. AT&T Mobility, LLC* (2011) 196 Cal.App.4th 1545, 1552.) " 'In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396 (*Sisemore*).)

"On appeal, we will affirm a 'trial court's decision to sustain the demurrer [if it] was correct on any theory. [Citation.]' [Citation.] Thus, 'we do not review the validity of the trial court's reasoning but only the propriety of the ruling itself.' " (*Sisemore*, *supra*, 151 Cal.App.4th at p. 1397.) Similarly, if the plaintiff's allegations demonstrate " 'the plaintiff is entitled to any relief at the hands of the court against the defendants, the complaint will be held good, although the facts may not be clearly stated, or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged.' " (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572.)[5]

---

[5] Ramsey also correctly contends that a trial court's decision to deny leave to amend is reviewed for abuse of discretion. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 863.) However, in its order sustaining the demurrer, the court wrote, "After argument was made, the court asked [Ramsey's counsel] whether, if the court were to adopt its [Tentative] Ruling, his client would request leave to amend. [Ramsey's counsel] stated he had pled all relevant facts and did not believe there were other facts he could allege which would address what the court noted as deficiencies in the pleading."

11.

"[T]he trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655.)

## II.  THE TRIAL COURT DID NOT ERR IN SUSTAINING THE DEMURRER TO RAMSEY'S FIRST CAUSE OF ACTION FOR INVERSE CONDEMNATION

The Fifth Amendment to the United States Constitution provides, in part, no private property shall be "taken for public use, without just compensation."  The California Constitution provides "somewhat broader protection by also requiring compensation when property is damaged for public use." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 260)  Article I, section 19 of the California Constitution reads, in part, "[p]rivate property may be taken or damaged for a public use and only when just compensation … has first been paid to, or into court for, the owner."

"Eminent domain and inverse condemnation are related but distinct areas of law. 'Both eminent domain proceedings and inverse condemnation actions implement the constitutional rule that private property may not be "taken or damaged" [citation] for public use without just compensation.  But "inverse condemnation and eminent domain proceedings are not identical.  A property owner initiates an inverse condemnation action, while an eminent domain proceeding is commenced by a public entity. [Citation.] Eminent domain actions typically focus on the amount of compensation owed the property owner, since by initiating the proceeding the government effectively

Ramsey has not taken issue with this representation and provides no argument or authority in his briefing on appeal to demonstrate the court abused its discretion in denying him leave to amend.  Nor does he indicate what amendments could be made in the event this court affirms the trial court's decision to sustain the demurrer.  " 'Issues do not have a life of their own:  If they are not raised or supported by argument or citation to authority, [they are] … waived.' " (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)  Accordingly, we deem the issue of whether the trial court abused its discretion in denying leave to amend waived.

12.

acknowledges that it seeks to 'take or damage' the property in question." [Citation.] "But the same is not true of inverse condemnation: '... [I]n an inverse condemnation action, the property owner must first clear the hurdle of establishing that the public entity has, in fact, taken [or damaged] his or her property before he or she can reach the issue of "just compensation." ' " ' " (*Weiss v. People ex rel. Dept. of Transportation* (2018) 20 Cal.App.5th 1156, 1166-1167.)

### A. Ramsey's First Cause of Action for Alleged Inverse Condemnation

Ramsey's first cause of action for inverse condemnation is premised on two alternative contentions: (1) the contention that City's rezoning of the subject property to Public Facilities/Drainage Basin has "eliminated all developmental, economically beneficial, or economically viable use of [the subject property] thereby resulted in a categorical, uncompensated taking of the [subject property]"; and (2) under the holding of *Penn Central Transportation Co. v. New York City* (1978) 438 U.S. 104 (*Penn Central*), the rezoning of the subject property "has frustrated [Ramsey's] reasonable investment-backed expectations"; "has had a devastating economic impact, as it has rendered over 99% of the [subject property] economically idle, vacant, and unusable for any productive purpose, let alone commercial use, and has extinguished nearly all of the [subject property's] economic value"; and "City's action improperly spot-zoned the [subject property]" for the purpose of depressing the market value of the property and obtaining the property at a lower price. Ramsey seeks damages in excess of 2.7 million plus interest, attorneys' fees, costs of suit and other allowable fees and expenses.

### B. No Cause of Action for Inverse Condemnation Under *Lucas v. S.C. Coastal Council* Has Been Stated

Ramsey relies on *Lucas v. S.C. Coastal Council* (1992) 505 U.S. 1003 (*Lucas*) to support his claim that City's rezoning action constituted a categorical taking. In *Lucas*, the plaintiff had purchased two lots near the South Carolina coast for purposes of building residential units on them. (*Id*. at pp. 1006-1007.) At the time of purchase, no

special permit was needed to develop the lots.  (*Id*. at p. 1008.)  However, after the plaintiff purchased the lots but before he developed them, the South Carolina Legislature enacted a new law that prohibited development of certain identified areas (including the plaintiffs' lots) in order to preserve the coastline.  (*Id*. at pp. 1007-1009.)  The plaintiff then filed suit for just compensation arguing that the new law extinguished the value of his lots.  (*Id*. at p. 1009.)

The *Lucas* court noted that two discrete categories of government regulation will result in a "taking" and require just compensation without an examination of the public interests advanced by the conduct:  (1) where a physical invasion of the property has occurred; and (2) "where regulation denies all economically beneficial or productive use of the land."  (*Lucas*, *supra*, 505 U.S. at p. 1015.)  The court noted, "regulations that leave the owner of land without economically beneficial or productive options  for its use—typically … by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm."  (*Id*. at p. 1018.)

Here, Ramsey does not contend there has been a physical invasion of the subject property by City.  His claim for damages under *Lucas* is premised on his contention the rezoning of his property has denied him all economically beneficial or productive use of the land.

### 1.    *Under the Municipal Code Private Economical Uses Are Available for PF Zoned Properties*

Ramsey contends the PF zoning under which the subject property now falls "is for quintessentially public uses and purposes" and argues the final sentence of Municipal Code section 18.36.010 "specifically limits who may establish public facilities on PF-zoned property."  He contends, "PF uses are allowed only on property owned and/or operated by a public entity."  In response, City points to the Municipal Code and the PF zone designation as allowing a number of different types of economically viable

14.

improvements to the property. City contends those uses are not, as suggested by Ramsey, available only to public entities and agencies but include uses available to private persons and entities.

For the reader's convenience, we again set forth the text of Municipal Code section 18.36.010, as follows:

> "This chapter shall apply to all land within the Public Facilities (PF) zone. The purpose of the PF zone is to provide locations for public and private institutional uses including, but not limited to, community facilities, parks, school facilities, libraries, cemeteries, wastewater treatment facilities, storm drainage basins, water recharge areas, public safety facilities (fire and police), public transportation and public works facilities, the Chowchilla Madera Fairgrounds, the Chowchilla Airport, and other similar public uses and facilities on property owned and/or operated by a local, state or federal agency."

Ramsey argues the final clause "on property owned and/or operated by a local, state or federal agency" applies to the entire definition of the PF zone. We disagree.

The second sentence of Municipal Code section 18.36.010 reads, "[t]he purpose of the PF zone is to provide locations for public *and private* institutional uses." (Municipal Code, § 18.36.010, emphasis added.) In addition, Municipal Code section 18.08.30 discusses other uses that may be undertaken by a private party and which are available "by right" for a property zoned PF including, *without limitation*: "Auditorium"; "College or university, public or private"; "School; charter, trade, vocational, art, business, or professional"; "Agricultural crop production"; "Hospital, general or psychiatric"; "Fuel sales, fleet, or cardlock"; "Construction materials recycling"; "Recycling, small collection facility (CRV only)"; "Recycling, large collection facility"; "Airport or heliport"; "Bus, transit, or train station"; "Food locker"; and "Other uses not listed that are determined by the director to be similar in nature to a listed use."[6] (Municipal Code,

---

[6] In addition, uses available "by right" under the PF zone designation and described as "Accessory and Support Uses" include "Automated teller machine (ATM)"; "Daycare primarily for children of employees on the same site as a permitted use"; "Electric vehicle recharging facility"; "Food service primarily for employees on the same site as a

§ 18.08.030, Table 18.08.030.)  Additional private uses are also possible subject to obtaining a CUP.[7]  (*Ibid.*)

Thus, private uses remain available under the Municipal Code for properties designated PF.

### 2. *Whether City Will Utilize the Subject Property as a Drainage Basin If and When It Exercises Its Power of Eminent Domain Over the Property is Irrelevant*

Ramsey alleged that " 'City will utilize the [subject property] as a drainage basin' in connection with the [highway project]"; and that " 'City has admitted that the [subject property] was designated [PF] in … City's General Plan based on the presence of the [highway project] and, to that end, the [n]ew [z]oning [m]ap was updated to reflect this designation in the General Plan' … [as] reflected in the zoning map … City adopted in 2019 when it downzoned [the subject property]."  Ramsey suggests that the manner in which City may use the subject property as identified above upon condemnation, if and when that occurs, bolsters its contention that Ramsey's use of the property is therefore restricted.  We disagree.

The question before us under the *Lucas* theory of inverse condemnation is whether the subject property is rendered valueless such that it entitles Ramsey to compensation— not whether City's use of the property, if and when condemnation occurs, has a commercial value.  As discussed above, Municipal Code sections 18.36.010 and 18.08.030 authorize a number of private uses available for PF zoned property.  Moreover, because Ramsey has not alleged he attempted to improve or develop his property in one of the ways authorized by said Municipal Code sections and was prohibited by City from

---

permitted use"; "Outdoor storage ancillary to and on the same site as a permitted use"; "Temporary materials and/or equipment storage yard"; and "Vending machines."

[7]     Private uses available for PF zoned properties upon obtaining a CUP include, "School, private (kindergarten to 12th grade)"; "Commercial recreation facility, outdoor"; "Golf course or country club"; "Swap meet or flea market"; "Shooting range, indoor"; and "Daycare center."

doing so, any contention he is unable to improve or develop his property for one of those authorized uses is speculative and, as discussed below, not ripe for adjudication.

### 3. *Contended Limitations on Expansion/Restoration Do Not Support a Claim for Damages Under Lucas*

Ramsey presents several additional facts and contentions he argues support his claim for inverse condemnation under *Lucas*. We set those forth below.

First, Ramsey argues he is prevented from seeking a variance under Municipal Code section . That provision reads, "A variance or minor deviation may be granted to waive or modify any development standard of this title except to: A. Allow a land use not otherwise allowed in the zone district; [¶] … [¶] [or] C. Waive a specifically identified prohibition." Ramsey also notes "City told … Ramsey's prospective buyer that the property was zoned [PF] and that it would therefore deny any application for commercial development."

Second, Ramsey contends he would be unable to expand the existing nonconforming use under Chapter 18.90 of the Municipal Code. Ramsey notes (1) that a 10 percent expansion of existing floor area is only allowed under Municipal Code section 18.90.070 if a CUP is obtained; (2) that if a nonconforming use has been abandoned or discontinued for a continuous period of six months, but less than 18 months, it may be reestablished only by obtaining a CUP (Municipal Code, § 18.90.060, subd. A); and (3) that reestablishment of a nonconforming use after it has been abandoned or discontinued for 18 months or more is prohibited (Municipal Code, § 18.90.070, subd. B). Ramsey argues the only structure on the subject property with floor area is the small office and has not been used as an office for more than 18 months, so it cannot be reestablished or expanded. Even if reestablishment and expansion were allowed, Ramsey argues, it would not "restore the [subject] property's value or allow the land to be put to productive, beneficial and viable use."

17.

Next, Ramsey also contends Municipal Code section 18.90.80 prohibits the restoration of the commercial building that was totally destroyed in 2017. Municipal Code section 18.90.80 provides, in part "[w]henever a nonconforming structure … is destroyed by fire … to the extent of fifty percent or more of its structural mass …, the structure may not be restored, except in full compliance with the requirements of this title for the zoning district in which it is located, and the nonconforming use shall not be resumed."

Ramsey further contends his property is not of a type that would lend itself to transitioning from one nonconforming use to another nonconforming use under Municipal Code section 18.90.110. That provision reads, in part, "A nonconforming use may be changed to another nonconforming use upon approval of a [CUP]." (Municipal Code, § 18.90.110, subd. A.) It then sets forth four required findings, two of which Ramsey contends he could not meet, namely: "1. The proposed use will not alter the character of the zone district … to any greater extent than the existing or preexisting nonconforming use; [¶] [and] 2. The proposed use will not create more vehicular traffic than the volume created by the existing or preexisting nonconforming use." (*Id*. at subd. B.1., 2.)

Finally, Ramsey takes issue with City's contention that Ramsey's ability to lease the subject property for 1/10th the market rental rate demonstrates it was not left " 'economically idle.' " Ramsey argues City is ignoring the fact that Ramsey "nominally leas[ed] the property to a month-to-month tenant"; the tenant is 22 months in arrears, has left the state, and no longer operates a business on the site; and Ramsey can find no one to lease the property.[8]

---

[8]     Although not central to our holding, we note Ramsey has not alleged he has attempted to lease the property to a new lessor to take over the lease of his existing tenant or to substitute it with a different lease. The assertion that he can find no one to lease the property is conclusory and unsupported by allegations in the governing complaint.

18.

Ramsey's contentions are unavailing. The holding in *Lucas*, upon which Ramsey partially relies, was limited to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." (*Lucas*, *supra*, 505 U.S. at pp. 1017, 1020, fn. 8.) This requirement of a total elimination of productive or economically beneficial use was reaffirmed by the high court 10 years later. (*Tahoe-Sierra Presentation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 330.) "Anything less than a 'complete elimination of value,' or a 'total loss,' … would require the kind of analysis applied in *Penn Central*." (*Tahoe-Sierra*, at p. 330.) Ramsey fails to demonstrate how the *alleged* inability to expand a nonconforming use currently renders his property valueless.

Even if we were to assume there is merit to Ramsey's contention that City's Municipal Code provisions prohibit him from expanding the floor area of the existing office space on the subject property; from restoring the preexisting nonconforming uses of the property; or from transitioning to another nonconforming use, the subject property continues to have economic value and options for improvement of the property do exist to potentially enhance its existing value. As discussed previously, private uses remain available "by right" to a PF zoned property under the wording of the Municipal Code and additional private uses are available upon obtaining a CUP.

Even absent such considerations, the allegations of the governing complaint reveal the subject property continues to have value. Since 2010, Ramsey has "been able to secure short term, month-to-month leases" and his current tenant (as of the date of the complaint) is leasing the property for $1,000 per month. Although this is alleged to be a mere fraction of the subject property's fair market rent, the property continues to have value. That the tenant is in arrears, has ceased his business operations, and moved to Colorado is not alleged to be due to any conduct of City. Nor is the fact that the parties agreed to terminate the lease or that Ramsey may have difficulty enforcing the tenant's lease obligations alleged to be due to any conduct of City. Substantial causation is a

19.

necessary element of an inverse condemnation claim.  (*City of Oroville v. Superior Court* (2019) 7 Cal.5th 1091, 1104.)  That element is lacking with respect to Ramsey's implied inability to enforce his tenant's lease obligations.

Although Ramsey alleges the tenant "has not agreed to pay back rent," the very existence of the lease and the allegation that the tenant "owes" back rent is an acknowledgement that the tenant is, in fact, subject to a legal obligation to pay back rent.  And, prior to his current tenant's lease,  Ramsey was able to lease the subject property for $800 per month during the period 2012 to 2017.

The allegations of the governing complaint demonstrate that the subject property has not lost all economic or productive value.  Moreover, the relevant Municipal Code provisions demonstrate the property has potential uses available to it "by right" and by CUP that have economic and/or productive value.

As noted by City, Ramsey "has never attempted to change the use of the [subject property], and speculation as to how … City would rule on a CUP application is not a substitute for a permit application."  City notes that, "[i]n *Lucas*, the government 'stipulated below that no building permit would have been issued' under the governing law, 'application or no application,' " citing *Lucas*, *supra*, 505 U.S. at page 1012, footnote 3.  City concludes, "[t]hus, the matter was ripe for review."

In addition, City argues that neither the Municipal Code nor the General Plan restrict Ramsey's ability to improve the property.  City contends Ramsey's contention to the contrary is "at odds with the General Plan, which states that for land that has not been acquired (such as the [subject property]), the [PF] designation 'shall not be construed to limit the existing or future use of the designated land.' "  Thus, City contends Ramsey "is not boxed in by either the Municipal Code or the General Plan."  Ramsey contends the General Plan provision referenced by City, when read in context, "means no such thing."  The paragraph at issue reads, in full:

20.

"The [PF] designation on the 2040 General Plan Land Use Map for any future public or institutional site that has not been acquired shall not be construed to limit the existing or future use of the designated land. The predominant land use designation surrounding any property designated for public facilities shall be used to determine the potential use of the property prior to its acquisition by the applicable governmental agency or private institution." (Hereafter, we refer to this provision as the "General Plan Caveat Provision.")

Ramsey contends the General Plan Caveat Provision is limited to the 2040 General Plan Land Use Map and does not provide similarly for the new zoning map adopted by City in May of 2019.

Ramsey argues that "[t]he law prohibits *any* improvements, except by a government owner or government lessee of the property"—a proposition we have determined lacks merit under the Municipal Code even absent consideration of the General Plan Caveat Provision. Ramsey continues by arguing that submitting a proposal to improve the property would have been "an utterly futile act" and that City has not provided authority to suggest he is barred from making a claim due to "the absence of a denied application for a specific project." Ramsey then cites to *Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 624-625 (*Palazzolo*) for the proposition that the submission of a proposal is unnecessary if it "would not have clarified the extent of development permitted …, which is the inquiry required under [the high court's] ripeness decisions" and *Pakdel v. City & County of San Francisco, California* (2021) ___ U.S. ___, 141 S.Ct. 2226, 2230, for the proposition that "[a]ll a plaintiff must show is that 'there [is] no question … about how the "regulations at issue apply to the particular land in question." ' "

We believe City has the better argument on the issue of ripeness. A controversy is ripe if it " 'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made. [Fn. omitted.]' [Citation.] Its purpose is to prevent courts from issuing purely advisory opinions. [Citation.] In this regard, 'the ripeness doctrine is primarily bottomed on the recognition

21.

that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Sherwyn v. Department of Social Services* (1985) 173 Cal.App.3d 52, 57.)

"A takings claim challenging the application of regulations to particular property must be ripe for consideration. Such a claim is not ripe until 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' [Citation.] 'A final decision by the responsible state agency informs the constitutional determination whether a regulation has deprived a landowner of "all economically beneficial use" of the property [citation], or defeated the reasonable investment-backed expectations of the landowner to the extent that a taking has occurred [citation]. These matters cannot be resolved in definitive terms until a court knows "the extent of permitted development" on the land in question. [Citation.]' [Citation.] The primary question to be answered in resolving this issue is whether the landowner 'obtained a final decision from the [agency] determining the permitted use for the land.' " (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1299 (*Dunn*).)

However, " '[w]hile a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened.' " (*Dunn*, *supra*, 135 Cal.App.4th at p. 1300.) "Ripeness doctrine does not require a landowner to submit applications for their own sake. [A plaintiff] is required to explore development opportunities on his … parcel only if there is uncertainty as to the land's permitted use." (*Palazzolo*, *supra*, 533 U.S. at p. 622.)

Additional considerations highlight the prudence of requiring a final decision from City concerning the extent to which Ramsey may develop or improve his property.

"[T]he [municipal] body which adopted … general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Save our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, 142.)

Here, City's proffered construction of the General Plan Caveat Provision is not unreasonable. On this record, we are unable to conclude, as a matter of law, that the Municipal Code and General Plan preclude Ramsey from developing the subject property in the same manner as those of his surrounding neighbors—i.e., commercial development under the "C-S" zone designation. Because Ramsey has not alleged any attempt or application to use or develop the subject property in a manner that differs from its current use, Ramsey has not tested City's contention that he "is not boxed in by either the Municipal Code or the General Plan." As a result, we conclude this issue is not ripe for determination.[9]

In any event, we conclude no cause of action for inverse condemnation under the holding of *Lucas* has been stated because the allegations of the governing complaint plainly indicate the subject property has value and, even under the Municipal Code when analyzed without consideration of the General Plan Caveat Provision, a number of economical uses for the subject property remain available to Ramsey.

---

[9]     We take no position on how City should interpret or apply the General Plan Caveat Provision. We simply note the issue is not ripe for adjudication absent a final determination from City in that regard.

## C. No Cause of Action for Inverse Condemnation Under *Penn Central* Has Been Stated

"There are compensable takings that do not involve the deprivation of *all* economically viable use of land.  The United States Supreme Court has declared that a compensable regulatory taking can occur when a regulation goes ' "too far," ' but stops short of denying all economically viable use." (*Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1272 (*Avenida San Juan*).)  "Whether a regulation goes 'too far' is tested under what has been called the '*Penn Central* factors' approach.  Our own Supreme Court has noted that there are three core factors:  (1) the economic effect on the landowner; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the governmental action." (*Avenida San Juan*, at p. 1272; *Penn Central*, *supra*, 438 U.S. at p. 124.)  No physical invasion of the property is required.  (*Avenida San Juan*, at p. 1274.)

### 1. The First and Second *Penn Central* Factors Weigh Against City's Alleged Liability

Ramsey contends that "[p]rior to the adoption of the new zoning map, [he] was legally entitled to develop and use [the subject property] for various commercial, economically-viable uses, but since the new zoning map's adoption, those uses are barred." (Unnecessary capitalization omitted.)  Ramsey asserts "he can no longer build on or make improvements to [the subject] property, and enjoys no developmental or economically beneficial use" of the property.  However, we have already determined this claim is unsupported by the Municipal Code even absent consideration of the General Plan Caveat Provision, and is not ripe for adjudication.

Ramsey also complains that, due to the downzoning, he "has made *no revenue* (let alone no profit) on the property for over 22 months."  "But for the downzoning," Ramsey concludes, he "would be able to attract long-term, paying tenants, or even sell the property to a willing purchaser."  In response, City argues there is "no nexus between the adoption of the zoning map and [Ramsey's] alleged economic harm."  (Unnecessary

24.

capitalization omitted.)  City notes Ramsey has charged a level of rent that did not change when the zoning map was adopted and that Ramsey's difficulties selling and below-market rent preexisted the zoning change.  City further notes Ramsey "has never proposed to do anything with [the subject property] (except to wait for it to be acquired by eminent domain)," and that he admits in his second amendment complaint "he has done little to keep up the [subject property], even to the point of failing to repair or replace a fire-damaged building."

The allegations of the governing complaint demonstrate Ramsey's tenant allegedly breached the existing lease on the property prior to City's adoption of the new zoning ordinances and zoning map.  (The governing complaint was filed in October of 2020 and alleges, as of the filing of that complaint, that his tenant was already "22 months behind in rent," which means the tenant was in breach of his lease obligation since at least January of 2019—yet the zoning ordinance was only passed in May of 2019.)  The allegations of the governing complaint make it clear that, as of the filing of the governing complaint, Ramsey had experienced difficulties leasing *and* selling the subject property for approximately a decade or more.

"Having acquired the property for commercial use, and now seeing that use extinguished," Ramsey contends he "has suffered substantial interference with his reasonable investment-back expectations."  Ramsey contends he "acquired the property as commercially zoned land, and having operated it as such for as long as he could, he had a reasonable expectation that his property would not suddenly become targeted for condemnation for a highway project."  Ramsey alleges he is unable to meet his "mortgage payments, property taxes, insurance, and general maintenance and upkeep associated with the [subject property], which are in excess of $10,000 per month."  He argues these facts demonstrate his expectations were " 'investment-backed.' "  He argues the purpose of this factor in the *Penn Central* test "is 'to limit recoveries to property owners who can demonstrate that they bought their property in reliance on a state of

25.

affairs that did not include the challenged regulatory regime,' " quoting *Cienega Gardens v. United States* (2003) 331 F.3d 1319, 1345-1346.

City notes, however, the governing complaint does "not identify any particular project related to the [subject property] that [Ramsey] had invested in and was thwarted by the zoning map." (Unnecessary capitalization omitted.) City argues the allegations of the governing complaint demonstrate Ramsey had no plans to develop the property further and, instead, allowed it to "fall into disrepair."

"[L]andowners have no vested right in existing or anticipated zoning ordinances. [Citation.] A purchaser of land merely acquires a right to continue a use instituted before the enactment of a more restrictive zoning." (*Morse v. San Luis Obispo County* (1967) 247 Cal.App.2d 600, 602; *Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 944 [quoting *Morse* with approval].) A plaintiff cannot allege a taking has occurred "simply by showing that [the plaintiff] [has] been denied the ability to exploit a property interest that they heretofore had believed was available for development." (*Penn Central*, *supra*, 438 U.S. at p. 130.)

To the extent Ramsey's cause of action for inverse condemnation under the *Penn Central* test is premised on his alleged inability to develop or improve the subject property, it suffers from the same defect as his claim under *Lucas*. The claim is not ripe for adjudication due to Ramsey's failure to seek approval to develop or improve the subject property. Moreover, City contends the General Plan Caveat Provision enables Ramsey to develop or improve the subject property in the same manner that surrounding owners are able to develop or improve their properties under the C-S commercial zoning designation. As discussed above, City's construction of the General Plan Caveat Provision is not unreasonable and we are unable to categorically state it is wrong. Thus, at this juncture, any allegation that Ramsey is unable to develop or improve the subject property is a mere conclusion which we are not required to accept as true. (*Sisemore*, *supra*, 151 Cal.App.4th at p. 1396.)

26.

In considering the first and second prongs of the *Penn Central* factors—i.e., "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" (*Penn Central*, *supra*, 438 U.S. at p. 124) we conclude Ramsey has not alleged any distinct investment-backed expectation.  We agree, in large part, with the trial court's statement that "[i]f merely buying the property for a given purpose, even with a mortgage, years before the rezoning that is the subject of this claim, was enough to constitute distinct investment-backed expectations, nearly every change in zoning would become a regulatory taking."

The allegations of the governing complaint and Ramsey's briefing on appeal demonstrate that Ramsey has eschewed submitting any proposal to City to develop or improve the subject property or to rebuild the metal building that he alleges was destroyed by fire; that he has continued the same use of the subject property he has made of it for the past decade; and that his ability to continue to use the property in the same manner he currently uses it is not hampered.  The facts alleged demonstrate Ramsey's economic situation vis-à-vis the subject property has not changed due to the rezoning of the property and do not demonstrate City's conduct has interfered with Ramsey's investment backed expectations.

### 2. The Third Penn Central Factor Likewise Weighs Against City's Alleged Liability

Ramsey contends "the clear intent behind the downzoning was to deplete any remaining value in … Ramsey's property in preparation for condemnation, which is an improper motive for zoning."  He notes that " 'good intentions motivating an otherwise lawful purpose do not negate liability for takings.' "  (Citing *Resource Investments, Inc. v. United States* (2009) 85 Fed.Cl. 447, 517.)  "The 'character' prong [of the *Penn Central* test]" he argues, should be " 'viewed in light of the principle that actions that closely resemble direct exercises of eminent domain are more likely to be compensable

27.

takings than are garden-variety land use regulations' that reflect a 'reciprocity of advantage' among landowners [citing Eagle, *The Four-Factor Penn Central Regulatory Takings Test* (2014) 118 Penn St. L. Rev. 601, 615, unnecessary capitalization omitted), whereby '[e]veryone loses [by the land-use restriction] but everyone gains' " [citing Merrill, *Taking Challenges to Land Use and Environmental Regulations* (2012) 36 Vt.L.Rev. 649, 664].  Ramsey argues City's downzoning of the subject property closely resembles a "direct exercise of its eminent domain power."

City notes, however, it was required to adopt a zoning map consistent with the General Plan, citing Government Code section 65860, and therefore the trial court correctly determined City's " 'adoption of the change in zoning' " more resembles the adoption of a general plan than a taking of land.

City's adoption of a general plan is required by law.  (Gov. Code, § 65300; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 535 (*Lesher*).)  Moreover, City was required, by law, to adopt a zoning scheme consistent with its General Plan.  (Gov. Code, § 65860, subd. (a) ["County or city zoning ordinances shall be consistent with the general plan of the county or city"]; *id.* at subd. (c) ["In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to the plan, or to any element of the plan, the zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended."].)  "Once the city has adopted a general plan, all zoning ordinances must be consistent with that plan, and to be consistent must be 'compatible with the objectives, policies, general land uses, and programs specified in such a plan.' " (*Lesher*, *supra*, at p. 536.)

As noted in *Smith v. State of California* (1975) 50 Cal.App.3d 529 "invocation of the doctrine of inverse condemnation or the assessment of damages against [a public entity] upon the public announcement of [a public entity's] plan would result in acquisition of large amounts of property that may never be used and would inordinately

28.

increase the cost of any such project." (*Id.* at p. 536.) A city's planning efforts would be severely hampered if it were subject to inverse condemnation claims simply for developing a general plan which it is required to do by law. (*Klopping*, *supra*, 8 Cal.3d at p. 45, fn. 1; *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 120-121 (*Selby*).) The same may fairly be said of a city's amendment of its zoning ordinances to conform to a general plan which also is an act required by law. (Gov. Code, § 65860, subds. (a), (c).)

Furthermore, the allegation that City rezoned the subject property in an effort to depress its value upon City's potential acquisition of it in the future, appears inconsistent with the General Plan Caveat Provision which reads, in part: "The predominant land use designation surrounding any property designated for public facilities shall be used to determine the potential use of the property prior to its acquisition by the applicable governmental agency or private institution." This provision would appear to prohibit using the PF designation as a means to depress value if and when City exercises its power of eminent domain over the subject property.

Based on the foregoing, we conclude City's conduct in adopting the General Plan and in amending its zoning ordinances does not closely resemble an exercise of City's power of eminent domain. The third prong of the *Penn Central* test is not met under the allegations of the governing complaint.

Based on the foregoing, we conclude the trial did not err in sustaining the demurrer to Ramsey's first cause of action for inverse condemnation.

III. **THE TRIAL COURT DID NOT ERR IN SUSTAINING THE DEMURRER TO RAMSEY'S SECOND CAUSE OF ACTION FOR *KLOPPING* DAMAGES**

Ramsey's second cause of action is for precondemnation damages (also referred to as *Klopping* damages). Ramsey alleges City's "precondemnation conduct has resulted in a special and direct interference with [the subject property], which has been singled out for unique treatment in contrast to other landowners who will be affected by the [highway

29.

project].”  The unique treatment alleged by Ramsey is the rezoning of the subject property to the PF zone designation.

In *Klopping*, the city adopted a resolution to initiate condemnation proceedings of various properties including one owned by plaintiff Klopping and one owned by plaintiff Sarff to build a parking district.  (*Klopping*, *supra*, 8 Cal.3d at p. 42.)  More than a year later, the city adopted a second resolution which (1) noted a legal challenge to the condemnation proceedings left it unable to secure financing for the parking district project; (2) advised the lack of funds prevented the proposed acquisition of property for the project; (3) determined it unfair and inequitable “to continue the restraining effect of the pending condemnation suit on the use of the properties sought to be condemned”; (4) authorized dismissal of pending condemnation suits; and (5) “declared the city’s firm intention to reinstitute [condemnation] proceedings when and if” the aforementioned legal challenge was resolved in the city’s favor.”  (*Ibid*.)  While that legal challenge remained pending, the plaintiffs separately sued for damages under inverse condemnation.  (*Id*. at p. 43.)

The city successfully demurred to each of the plaintiffs’ suits and plaintiffs appealed.  (*Klopping*, *supra*, 8 Cal.3d at p. 43.)  The matters made their way to the California Supreme Court and were consolidated for decision.  (*Ibid*.)

The *Klopping* court recognized certain competing considerations at stake.  It wrote, “[t]o allow recovery in every instance in which a public authority announces its intention to condemn some unspecified portion of a larger area in which an individual’s land is located would be to severely hamper long-range planning by such authorities [citation], some of which may be required by state law (see generally Gov. Code, § 65101 et seq.).  On the other hand, it would be manifestly unfair and violate the constitutional requirement of just compensation to allow a condemning agency to depress land values in a general geographical area prior to making its decision to take a particular parcel located in that area.”  (*Klopping*, *supra*, 8 Cal.3d at p. 45, fn. 1.)

30.

Our Supreme Court reversed the judgment against one of the plaintiffs.[10] (*Klopping*, *supra*, 8 Cal.3d at p. 59.) In doing so, the high court recognized a cause of action for precondemnation damages where a plaintiff demonstrates "(1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping*, *supra*, 8 Cal.3d at p. 52, fn. omitted.)

"Absent a formal resolution of condemnation, the public entity's conduct must have 'significantly invaded or appropriated the use or enjoyment of' the property. [Citation.] Thus, decisions generally have required a showing that the public entity 'acted affirmatively to lower the value of the subject property, physically burdened the property, and/or decreased the income the property produced.' [Citation.] For this reason, mere designation of property for public acquisition, even though it may affect the marketability of the property is not sufficient." (*Barthelemy v. Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558, 565 (*Barthelemy*).)

"[A]ctionable injury under *Klopping* must go beyond the unavoidable consequences of an agency's designation of property for possible acquisition. The degree of impairment of a landowner's property rights which is required for a compensable *Klopping* injury is illustrated in the Supreme Court's decision in *Jones v. People ex rel. Dept. of Transportation* (1978) 22 Cal.3d 144 …. There, the court found liability under *Klopping* where, due to the state's plans to construct a freeway which would require part of the plaintiffs' land, the county refused to approve the plaintiffs' subdivision map. (*Id.* at p. 152.) At the same time, the court recognized that 'if the only acts of which plaintiffs complain were the adoption of the route, the designation of their

---

**10** As to the other plaintiff, the high court in *Klopping* affirmed the judgment on the ground that his property was ultimately condemned by the city in a second condemnation proceeding and that he was required to seek his claimed damages in that proceeding. (*Klopping*, *supra*, 8 Cal.3d at p. 58.)

land for future acquisition, and the purchase of some of the properties along the right of way, there would be no such direct and special interference with plaintiffs' rights as to justify an action in inverse condemnation.' " (*Barthelemy*, *supra*, 65 Cal.App.4th at p. 570.)

In *Selby*, our state's high court determined that the adoption of a general plan was, by itself, insufficient to trigger liability under *Klopping*. (*Selby*, *supra*, 10 Cal.3d 110, 119-120.) A general plan "is subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made" of private land depicted in the general plan. (*Id.* at p. 120.) Ramsey acknowledges the adoption of a general plan is an insufficient basis upon which to premise liability. Ramsey contends, however, "City went far beyond engaging in simple planning" by "identifying [the subject property] as a site for potential future acquisition" and "downzoning the property to Public Facilities/Drainage Basin, which is precisely what [the subject property] will be utilized for in connection with the [highway project]." (Unnecessary emphasis omitted.)

In analyzing Ramsey's second cause of action, we find the case of *Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492 (*Joffe*) to be particularly instructive. The plaintiff *Joffe* was the owner and operator of a furniture manufacturing business (also a named plaintiff) specializing in "made to order" furniture "requiring long and predictable lead times between the receipt of the order and the contractually promised dates of delivery." (*Id*. at p. 498.) Beginning in 2002, the city and various developers "repeatedly expressed the intent and desire to acquire … two adjacent 40-acre sites" to develop a retail center consisting of retailers, shops and restaurants. (*Ibid*.) "During the period 2002 through 2008, [the] plaintiffs were repeatedly informed by … the [c]ity ... and the developer[s] … that the project was on track and that Joffe's property was going to be acquired by the [c]ity" for that purpose. (*Id*. at p. 499.) The city appraised Joffe's property; analyzed his business for relocation; requested he obtain an appraisal so that negotiations for the purchase of Joffe's property could begin; "erected large signs in the

32.

vicinity of Joffe's property announcing the project"; communicated orally and in writing that his "property would be acquired for the project either voluntarily or involuntarily"; and city officials "continually expressed their present and specific intent to build … the project" in the years leading up to the filing of the plaintiffs' lawsuit. (*Id*. at pp. 499-500.)

Joffe alleged the city's conduct caused him to be unable to profitably conduct his business on his property. (*Joffe*, *supra*, 201 Cal.App.4th at pp. 500-501.) Without certainty that its possession of the property would continue, Joffe was unable to ensure his customers that the business could timely complete their orders. (*Id*. at p. 501.) Having advised his clients of this fact, his business "was unable to procure orders" and its "profitability … deteriorate[d] to the point of lost profits and goodwill and, ultimately, an inability to pay its rent obligation." (*Ibid*.) As a result, the company "was forced out of business at [its] location" and Joffe was unable to find tenant's to rent the property at fair market rent due to the uncertainty over the duration of any lease he might enter into. (*Ibid*.)

Joffe sued the city and its developers under the *Klopping* rule alleging (1) city's conduct and repeated statements, taken together, constituted an " 'announcement of intent to condemn' " thus, "justifying recovery for an unreasonable delay following the announcement"; and (2) city's conduct was unreasonable. (*Joffe*, supra, 201 Cal.App.4th at p. 502.) The city demurred and the trial court sustained the demurrer without leave to amend.

In affirming the trial court's order to sustain the demurrer, the *Joffe* court noted, "[w]hen a public entity makes known its intent to acquire property for public use, this statement alone could make the property value increase or decrease, depending on numerous factors. But, just as the public entity should not be required to pay an additional premium for a property simply because it is known to be necessary for a public project, the public entity should also not be allowed to benefit from a decline in market

value following an announcement of condemnation which results in tenants leaving the property." (*Joffe*, *supra*, Cal.App.4th at p. 506, fn. 10.) " 'However, when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated.' " (*Id*. at p. 506.)

The *Joffe* court noted that, in *Klopping* "there was no doubt that the City of Whittier had announced its intent to condemn," having "(1) adopted a resolution for the initiation of eminent domain proceedings; (2) actually commenced eminent domain proceedings; and (3) adopted a second resolution authorizing dismissal of the proceedings but declaring the city's firm intention to reinstitute proceedings when and if [a pending lawsuit] was resolved in its favor." (*Joffe*, *supra*, 201 Cal.App.4th at pp. 506-507, citing *Klopping*, *supra*, 8 Cal.3d at p. 42.) The *Joffe* court noted the facts before it were different in that "the [c]ity did not commence eminent domain proceedings and adopted no resolution of necessity." (*Joffe*, *supra*, at p. 507.)

"[I]n the absence of a resolution of necessity, a plaintiff must allege that the conduct of the public entity has resulted 'in a special and direct interference with the owner's property.' " (*Joffe*, *supra*, 201 Cal.App.4th at p. 507.) "[P]recondemnation announcements alone should not subject public entities to liability, and that landowners must bear some incidental loss resulting from such general planning announcements. Thus, liability can attach only when the public entity's conduct has passed from the *planning* stage into the *acquiring* stage." (*Ibid*.) "Liability only attaches when the public entity has taken some action toward actually acquiring the property." (*Id*. at pp. 507-508.)

On appeal, *Joffe* "eliminate[d] from [its] analysis any conduct which constitute[d] general planning as a matter of law." (*Joffe*, *supra*, 201 Cal.App.4th at p. 508.) The court then indicated appraising a property was a "necessary preliminary step toward

34.

possibly acquiring the property" and declined to hold that such conduct "has evolved from 'planning' to 'acquiring.' " (*Ibid*.) The court found it " 'most significant' " that the city had not made an offer to purchase the property. (*Id*. at p. 509.) *Joffe* also concluded the communications between the city and the plaintiff indicating the property would be acquired fell short of an act of acquisition. (*Ibid*.)

The fact that the bulk of the plaintiff's business was driven away by the city's conduct was likewise insufficient to hold the city liable for its conduct. (*Joffe*, *supra*, 201 Cal.App.4th at p. 509.) The court noted, "*Klopping* liability does not depend on specific and unique harm, but specific and direct interference. In other words, the focus is on [the] defendants' conduct and whether it amounted to an interference with plaintiffs' right to use and enjoy their property." (*Ibid*., italics omitted.) " 'Absent a formal resolution of condemnation, the public entity's conduct must have "significantly invaded or appropriated the use or enjoyment of" the property.' [Citation.] Thus, decisions generally have required a showing that the public entity "acted affirmatively to lower the value of the subject property, physically burdened the property, and/or decreased the income the property produced." ' " (*Id.* at pp. 509-510, quoting *Barthelemy*, *supra*, 65 Cal.App.4th at p. 565.)

In affirming the trial court's order to sustain the city's demurrer, the *Joffe* court concluded the city's acts were "simply acts of planning for the project which, ultimately, never came to fruition." (*Joffe*, *supra*, 201 Cal.App.4th at p. 511.) The court noted there were no allegations (1) that the city "acted as they did 'for the purpose of depressing the fair market value and preventing plaintiffs from using their land.' "; (2) that the city officials who told Joffe his property would be acquired or that the project would commence within a certain time frame knew the representations were false; (3) that there was an intent to intimidate Joffe into selling his property below fair market value; and (4) that the city officials were aware of the unique characteristics of Joffe's business. (*Id*. at p. 512.) Absent such allegations, the court wrote, "plaintiffs have alleged only that the

35.

[c]ity … performed some planning activity on a project that was never built. This cannot constitute unreasonable conduct as a matter of law." (*Ibid*.)

The facts in *Joffe* are not much different from those at issue here. In *Joffe*, as in the case before us, the city made known to the public that it was planning a project that would result in the condemnation of the plaintiff's property; had the property appraised and requested the plaintiff obtain an appraisal to allow for negotiations to purchase the property; communicated to the plaintiff, in writing and orally, its intent to obtain the property "either voluntarily or involuntarily"; and over the course of many years "continually expressed their present and specific intent to build and develop the project." (*Joffe*, *supra*, 201 Cal.App.4th at pp. 499-500.)

Our facts differ from those in *Joffe* in that, here, City adopted a General Plan whereas *Joffe* makes no mention of the existence of a general plan; City performed an environmental study related to the subject property; and City adopted a new zoning map identifying the subject property as zoned PF unlike neighboring properties.

We have previously noted that the adoption of a general plan is a required City function. (Gov. Code, § 65300.) It is, as its name suggests, a planning document. Liability for inverse condemnation or precondemnation damages cannot be premised on its adoption. (*Selby*, *supra*, 10 Cal.3d at 120-121.) Similarly, conducting environmental studies is a planning process. Such studies play an informational role and apprise the public and public and private entities of the environmental consequences of contemplated action. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 404 [discussing the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.].) In the case before us, the environmental study contains alternatives including, in this case, a "No-Build" alternative, thus further highlighting its nature as a planning document.

With regard to the rezoning of the property, that act was also required under the law. (Gov. Code, § 65860, subds. (a), (c).) Moreover, as noted previously, Ramsey

never attempted to obtain City approval of any permits or plans to improve or develop his property and, as a result, never obtained a final determination from City denying any such permits or plans. City's counsel, on appeal, argues the General Plan Caveat Provision would allow Ramsey the ability to improve or develop his property just as surrounding properties are allowed. As mentioned, we cannot say this is an unreasonable interpretation of the provision and, without Ramsey having attempted such improvement or development and received a final determination by City, the issue is not sufficiently ripe for adjudication. The hearsay allegation that Ramsey's "prospective buyer was told by a City engineer that the [subject property] was zoned [PF], and, therefore, any application for a proposed commercial development on the [subject property] would be denied by … City" is not a substitute for a final determination by City and, by itself, does not demonstrate an application for development or improvement of the subject property would be futile.

The allegations of the governing complaint do not demonstrate City's conduct had progressed from the planning stage to the acquiring stage. City's alleged conduct did not constitute an announcement to condemn the subject property sufficient for potential liability under *Klopping* and, thus, there was no unreasonable delay following an announcement to condemn. The allegations of the governing complaint do not demonstrate unreasonable conduct on the part of City.

Finally, Ramsey's actual (and decade-long) use of the subject property was not altered in any way by City's conduct. Ramsey's alleged inability to sell the subject property or profitably lease/rent the subject property predated the rezoning of the property by many years. As mentioned, we cannot conclude that Ramsey's ability to alter the use of the subject property to a *more* productive and economically viable use is or was foreclosed and, importantly, we have determined that issue is not ripe for adjudication. In short, the allegations of the governing complaint fail to show a special or direct interference with the subject property or its use by Ramsey.

37.

Consequently, we conclude no cause of action for *Klopping* damages has been stated.  The trial court did not err in sustaining City's demurrer to Ramsey's second cause of action.

## DISPOSITION

We affirm the judgment of dismissal entered against Jeffrey W. Ramsey and in favor of the City of Chowchilla.  Costs on appeal are awarded to the City of Chowchilla.

SMITH, J.

WE CONCUR:

FRANSON, Acting P. J.

PEÑA, J.

38.